**In re Sally M. GRIGAS, Debtor.**

**Sally M. Grigas, Plaintiff,**

v.

**Sallie Mae Servicing Corp., et al., Defendants.**

**Bankruptcy No. 99–11021–JMD.
Adversary No. 99–1124–JMD.**

United States Bankruptcy Court, D. New Hampshire.

Aug. 22, 2000.

---

Grenville Clark, III, Gray, Wendell & Clark, for plaintiff.

Joel T. Brighton, Wiggin & Nourie, P.A., for defendants.

## *MEMORANDUM OPINION*

J. MICHAEL DEASY, Bankruptcy Judge.

### I. BACKGROUND

On March 29, 1999, Sally M. Grigas (the "Debtor") filed the above-captioned bankruptcy case under Chapter 7 of the Bankruptcy Code. On her Schedule F accompanying her bankruptcy petition, the Debtor listed the following two outstanding educational debts: (1) $11,414.59 owed to Sallie Mae Servicing (the "First Debt"); and (2) $64,232.29 owed to USA Group Loan Services, Inc. (the "Second Debt"). It is undisputed that these debts were subsequently assigned to the Educational Credit Management Corporation ("ECMC").[1] Although the number of obligations is nominally set at two, the two obligations in actuality represent a series of multiple loan transactions. The First Debt represents two separate promissory notes and loan disbursements while the Second Debt represents a series of thirteen separate promissory notes and loan disbursements. *See* Defendants' Exs. 101 through 115. It is these obligations that form the basis of the instant dispute.[2] The Debtor argues that they should be declared dischargeable, while the Defendants maintain that

---

1. For simplicity purposes, the Court will assume ECMC to be the relevant creditor.

2. The exact amount of the debts in question is not clear. It appears that the First Debt amounted to $68,767.11 as of January 12, 1999. *See* Plaintiff's Complaint ¶ 5. As of September 13, 1999, the Second Debt appeared to equal $12,141.49. *See* Defendants' Answer ¶ 4. Although the evidence regarding the amounts of the obligations is murky at best, quantitative exactitude is not crucial to the issues before the Court.

they are non-dischargeable pursuant to 11 U.S.C. § 523(a)(8).[3]

The Debtor is a 50 year-old woman who, admirably, pursued an education later in life. The loans in question represent the financing of an art education spanning eight years and three separate schools. The Debtor first received her Bachelors in Fine Arts in 1994 and, in 1996, she received a Masters in Fine Arts. A year later, she received her teachers' certification with a view towards teaching in the field of art. Before pursuing her art education, the Debtor worked full-time for a period of roughly 20 years in various secretarial and administrative positions. During that period, the most the Debtor earned annually was $17,035.00. See Plaintiff's Ex. 2, SSA Personal Earnings and Benefit Estimate Statement, at 2.

Currently, the Debtor resides at home with her parents and lives what can best be described as a meager lifestyle. She pays no rent to her parents, but the Debtor indicated at trial that they desire her to find alternative living arrangements. The Debtor's income is derived from two sources. First, during the school year, the Debtor teaches art classes on a part-time basis at a local college.[4] Second, the Debtor operates an art studio wherein she teaches students privately. At trial, the Debtor submitted copies of her Schedules I and J and testified that they reflect all of her projected income and expenses for the upcoming year. She also testified that the projections are "optimistic." No evidence was offered rebutting the Debtor's Schedules I and J. Accordingly, the Court will proceed on the assumption that they accurately reflect the Debtor's income and expenses for at least the upcoming year. Schedule I indicates a total income, which reflects both the Debtor's teaching and studio income sources, of $863.49 per month. See Plaintiff's Ex. 1–a, Schedule I. Schedule J reveals monthly expenses equal to $902.25, which yields a net monthly deficit of $38.76. See id.

At trial, the Debtor testified that she has diligently searched for a full-time teaching position, but to no avail. However, the Debtor also testified that she has not pursued employment in areas not related to the art field, such as secretarial or administrative work, since it is her goal to be a full-time art teacher. Evidence was also offered indicating that the Debtor suffers from glaucoma, with the result that a certain range of her vision is blurred. See Plaintiff's Ex. 8, Deposition of Joseph Ducharme, M.D., at 7–8. This condition is permanent and no treatment is available to cure the defect. See id. at 8. However, the evidence also indicates that the Debtor's condition is likely to stabilize and that her condition does not render her disabled. See id. at 14–15. The Debtor testified that she is able to drive, but maintained that her condition will likely impede future employment in the field of art.

The Debtor made sporadic payments on the instant loans during 1997 and 1998, but, on the whole, has failed to make most required installments. As one might glean from her meager financial position, the Debtor has been unable to afford her student loan payments given her current employment status. The Debtor has contacted the relevant student loan creditors in an effort to reduce her monthly payments, but has been unable to find common ground. The Debtor offered to pay $200.00 per month over a period of 10 years, whereas ECMC has indicated its willingness to accept $650.00 per month

---

3. Unless otherwise noted, all section references hereinafter are to Title 11 of the United States Code.

4. At trial, the Debtor testified that she was previously employed in a temporary full-time position at the same college, but that she expects her current part-time status to continue indefinitely.

over a period of 30 years. *See* Defendants' Pretrial Statement, at 3. Given the wide chasm between the parties' settlement positions, the parties look to this Court for resolution.

The parties' arguments raise two threshold issues before the final issue of dischargeability may be addressed. First, the Debtor disputes the existence of the loans in question on the ground that the Defendant is unable to produce originals or true copies with respect to the underlying notes. Second, the Defendant maintains that the Court has the authority to determine dischargeability on a partial basis, whereas the Debtor argues that the Court's authority under § 523(a)(8) is circumscribed so that it must decide dischargeability with respect to all student loan obligations as one debt. That is, the parties disagree as to whether this is an "all or nothing" dischargeability case. Once these issues are resolved, the question of whether § 523(a)(8) allows the instant debts to be discharged may be addressed.

The Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. DISCUSSION

### A. Existence of the Instant Debts

In her pleadings and argument at trial, the Debtor puts into dispute the existence of the obligations at issue. More specifically, the Debtor maintains that ECMC has been unable to produce the original notes or true copies, and therefore has not met its burden of proving the existence of the debts it says the Debtor

owes. Of course, if the Debtor's position is correct, this matter would be quickly short-circuited. However, the evidence does not lend credence to the Debtor's argument. At trial, counsel for ECMC offered copies of each note in question with accompanying affidavits from the relevant creditors stating that the original notes were lost or misplaced, but that the stated terms were correct. *See* Defendants' Exs. 101 through 115. Moreover, the Debtor testified at trial that the signatures on the copies offered by ECMC were indeed hers and that, to the best of her recollection, the copies represented loans that she did in fact receive. Based on this evidence, the Court is satisfied that ECMC has met its burden of proving the existence of the obligations at issue. Accordingly, the Debtor's first argument must fail.

### B. Whether Partial Discharge is Available under § 523(a)(8)

The parties disagree as to whether § 523(a)(8) grants this Court the power to determine whether the Debtor's student loan obligations are dischargeable on a partial basis. Such disagreement is not without considerable ancestry. Indeed, the issue of whether partial discharge is available under § 523(a)(8) has proved vexing to the judiciary, with the result that two opposing camps have been firmly assembled and a third camp is emerging. All three camps arrive at different ends, but start at the same beginning: the language of § 523(a)(8). Section 523(a)(8) provides that an educational loan shall not be discharged, "unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents...." 11 U.S.C. § 523(a)(8). Although all sides acknowledge the thrust of this language, difference exists regarding its malleability.

#### 1. The Strict Approach

One camp concludes that § 523(a)(8) does not allow a partial discharge by rea-

soning that the section's plain language creates an all or nothing framework. *See, e.g., United Student Aid Funds, Inc. v. Taylor (In re Taylor),* 223 B.R. 747, 752–53 (9th Cir. BAP 1998); *Thomsen v. Dept. of Education (In re Thomsen),* 234 B.R. 506 (Bankr.D.Mont.1999). In other words, courts in the "strict" camp hold that § 523(a)(8) does not allow a court to restructure student loans by discharging them in part. According to such courts, a debtor's student loans are either dischargeable *in toto,* or they are not. *See Taylor,* 223 B.R. at 752 ("[T]he plain language of 523(a)(8) supports Appellants' position that the *entire* student loan debt is either nondischargeable or dischargeable on the basis of undue hardship.") (emphasis added); *Hawkins v. Buena Vista College (In re Hawkins),* 187 B.R. 294, 300 (Bankr.N.D.Iowa 1995) ("This is an all-or-nothing proposition."). Middle ground does not exist in the strict camp.

The strict camp grounds its view in the overall structure of § 523(a) itself. They observe that Congress has allowed partial discharges in other subsections of § 523(a), such as (a)(2), (a)(5), and (a)(7), by excepting debts from discharge "to the extent" they trigger a certain result, and that such language is noticeably absent from § 523(a)(8). *See Taylor,* 223 B.R. at 753; *Hawkins,* 187 B.R. at 301. Accordingly, the strict camp concludes that § 523(a)(8)'s plain language indicates that Congress did not intend the availability of partial discharges within the context of § 523(a)(8). *See Taylor,* 223 B.R. at 753 ("[B]ecause the plain language of § 523(a)(8) implies that only the entire debt can be discharged for undue hardship, and because Congress expressly limited the extent of a debt's discharge in other subsections of § 523, we hold that § 523(a)(8) does not authorize a partial discharge of student loans."). These courts further reason that their position is borne out by the modern jurisprudential view that the Bankruptcy Code should be interpreted based upon the plain meaning of its lexicon. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

Although this Court agrees with the statutory reasoning of the strict camp, it finds the results troubling and, at the margins, contrary to what Congress intended in enacting § 523(a)(8). It is generally agreed that, in enacting § 523(a)(8), Congress intended to create a higher dischargeability threshold for student loans vis-a-vis other debts, thereby protecting the availability of student loans. *See* 4 King et al., *Collier on Bankruptcy* ¶ 523.-LH[3] (15th rev. ed.1998). The problem with the strict approach is that it potentially runs counter to such an intention. For example, if it would not be an undue hardship for a debtor to repay $10,000 in student loans, but he or she has $15,000 in such loans outstanding, the strict approach would allow the discharge of the entire $15,000. Such a result cannot be squared with the legislative purpose underlying § 523(a)(8). Consequently, in an effort to further Congress's intention in enacting § 523(a)(8), other courts have dared to look beyond the plain meaning paradigm.

## 2. The Flexible Approach

In contrast to the strict camp, the opposing view concludes that § 523(a)(8) does allow a partial discharge. Courts within the "flexible" camp hold that a debtor's student loans may be partially discharged in a multitude of ways, including the discharge of a partial principal amount. *See, e.g., Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby),* 144 F.3d 433, 440 (6th Cir.1998) (stating that a partial § 523(a)(8) discharge may be effectuated by "discharging an arbitrary amount of the principal, interest accrued, or attorney's fees; by instituting a repayment schedule; by deferring the debtor's repayment of the student loans; or by

simply acknowledging that a debtor may reopen bankruptcy proceedings to revisit the question of undue hardship").

The flexible camp reaches its conclusions in one of two ways. First, some courts conclude that the language of § 523(a)(8) is ambiguous and therefore, by its terms, allows a partial discharge of student loans. *See, e.g., Rivers v. United Student Aid Funds, Inc. (In re Rivers)*, 213 B.R. 616, 618 (Bankr.S.D.Ga.1997). Second, some courts find that § 523(a)(8) allows a partial discharge when it is viewed through the lens of § 105(a), the residual equity sword often wielded by bankruptcy courts to achieve fair results. *See, e.g., Fraley v. U.S. Dept. of Ed. et al.*, 247 B.R. 417, 422 (Bankr.N.D.Ohio 2000); *Fox v. Student Loan Mktg. Ass'n (In re Fox)*, 189 B.R. 115, 120 (Bankr.N.D.Ohio 1995). In other words, such courts conclude that § 105(a) allows the application of § 523(a)(8) on a partial basis. Although courts within the flexible camp use different routes, all reach the conclusion that a debtor's student loans may be restructured through a partial discharge.

 Although this Court agrees with the equitable results reached through the flexible approach, particularly considering Congress's purpose in enacting § 523(a)(8), it cannot agree with the statutory reasoning employed by the flexible camp in reaching such ends. For better or worse, bankruptcy courts do indeed exist in an era in which statutory provisions are to be interpreted according to their plain meaning. This Court finds that § 523(a)(8)'s language provides that a single educational debt cannot be partially discharged. Distilled to its essence, § 523(a)(8) provides that an educational debt cannot be discharged unless excepting *that* debt from discharge would cause an undue hardship. *See* 11 U.S.C. § 523(a)(8). Section 523(a)(8)'s language refers to a debt in its totality, and does not

envision only a portion being discharged. This conclusion is strengthened by the observation that Congress knows how to allow a partial discharge when it so desires, and has done so in statutory subsections coexisting with § 523(a)(8). It is a fundamental tenet of statutory interpretation that "where Congress has failed to include language in statutes, it is presumed to be intentional when the phrase is used elsewhere in the Code." *Taylor*, 223 B.R. at 753 (citing *Bates v. United States*, 522 U.S. 23, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997)). Moreover, this Court views its § 105 powers as limited with respect to granting a partial discharge in the context of § 523(a)(8). A bankruptcy court's equitable power under § 105 is limited to advancing the Bankruptcy Code within the confines of its text. *See Thinking Machs. Corp. v. Mellon Fin. Serv. Corp. (In re Thinking Machs. Corp.)*, 67 F.3d 1021, 1028 (1st Cir.1995). Section 105 cannot, therefore, be used to turn a Code provision on its head. The text of § 523(a)(8) does not allow a partial discharge, and § 105 cannot be used to rewrite such language.

Other courts have faced the logical pickle in which this Court now finds itself. In an effort to resolve the puzzle, a third view has emerged, a view that strives to reach the equitable results found in the flexible camp, but through the methodology employed by the strict camp. This third view, the "hybrid" approach, concludes that a proper analysis of § 523(a)(8) does not begin and end with the conclusion that a debtor's educational debt cannot be partially discharged; additional, and more subtle, statutory parsing is required.

### 3. The Hybrid Approach

 As its name implies, the "hybrid" approach employs reasoning found in both the strict and flexible camps. In essence, courts within the hybrid camp agree with the strict camp, insofar that it holds that a single educational debt cannot be restruc-

tured so that only a portion is discharged. However, the hybrid camp goes one analytical step further by concluding that, in applying § 523(a)(8), a debtor's student loans need not be aggregated, and that § 523(a)(8) may be applied on an independent basis, thereby often reaching the equitable results found in the flexible camp. In other words, the hybrid approach applies § 523(a)(8) to a debtor's educational debt on a loan-by-loan basis, with the result that some of a debtor's student loans may be discharged while others may be found nondischargeable.

The hybrid approach appears to have been first proposed in *Hinkle v. Wheaton College (In re Hinkle)*, 200 B.R. 690 (Bankr.W.D.Wash.1996). In *Hinkle*, the court concluded: "[w]hile a bankruptcy court cannot restructure the loans [under § 523(a)(8)], there is no reason that it cannot treat each one separately for the purpose of dischargeability, if the loans have not been consolidated by agreement of the parties."[5] *Id.* at 693. More recently, the Bankruptcy Appellate Panel of the Eighth Circuit has adopted the hybrid approach. *See Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 134 (8th Cir. BAP 1999).

Courts within the hybrid camp first conclude that, like the strict approach, § 523(a)(8) does not allow the partial discharge of student debts. *See Hinkle*, 200 B.R. at 693. However, they further observe that many courts fail to recognize the fact that although educational debts often involve a single lender, they usually reflect a multitude of individual loans.[6] The hybrid camp finds deficiencies in both the strict and flexible approaches by observing that in addressing the § 523(a)(8) partial dischargeability issue, many courts treat separate educational obligations as a single debt without further discussion. *See Andresen*, 232 B.R. at 134 ("The cases deal with the debt in aggregate, perhaps misled merely because multiple loans are often held by one lender, servicer or guarantor which may subtly manage to blend multiple liabilities on actually different claims into one single debt."). Courts within the hybrid camp conclude that not separating educational debts into their individual loan components in this context is a misapplication of § 523(a)(8). They reason that § 523(a)(8)'s plain language refers to a student loan, an overpayment, or any obligation, and that "[t]he words provided in the section are clearly singular." *Id.* This conclusion allows such courts to use the strict camp's reasoning to reach results often found in the flexible camp.

Because this Court finds merit in both the strict and flexible approaches, it adopts the hybrid approach. In this Court's view, the hybrid approach reaches a result that employs the best of both opposing camps.[7] It remains true to § 523(a)(8)'s statutory

---

**5.** No evidence was presented that any of the loans in this proceeding have been consolidated.

**6.** The instant case is no exception. Although there are two primary lenders, this proceeding involves 15 separate loan obligations.

**7.** This Court does not approach the § 523(a)(8) partial dischargeability issue with the luxury of a clean slate. Indeed, two somewhat conflicting decisions exist in this district with respect to the issue. In 1994, the late Judge Yacos issued an opinion wherein he expressed the view, in dicta, that a partial discharge is not available with respect to

§ 523(a)(8). *See Barrows v. Ill. Student Assistance Comm'n (In re Barrows)*, 182 B.R. 640, 653 (Bankr.D.N.H.1994) ("[W]hile there is some conflicting case law ... I believe the better view is that Congress in the statutory provisions in question has given the bankruptcy court only power to determine dischargeability or nondischargeability per se ... and not any power to grant partial discharges."). By contrast, Judge Vaughn, in concluding that § 523(a)(15) allows a partial discharge, has cited with approval certain cases finding that § 523(a)(8) opens similar doors. *See Gagne v. Gagne (In re Gagne)*, 244 B.R. 544, 548 (Bankr.D.N.H.1998). Although neither decision answers the issue directly, both imply differing results. This Court, however,

language while reaching results that comport with Congress's underlying purpose. It is the most logical and equitable interpretation of § 523(a)(8). Accordingly, this Court holds that, although § 523(a)(8) does not allow a single debt to be partially discharged, individual educational loans may be discharged while others may be declared non-dischargeable depending on whether each loan, on a cumulative basis, imposes an undue hardship on the debtor and his or her dependents. Consequently, in the instant case, the Court shall independently determine whether each of the Debtor's 15 individual loan obligations imposes an undue hardship under § 523(a)(8), taking into consideration whether the remaining loan obligations are dischargeable.

## C. Whether the Obligations Impose an Undue Hardship

■ In determining what constitutes an undue hardship pursuant to § 523(a)(8), Judge Vaughn of this district has adopted a three-part test set forth by the Court of Appeals for the Second Circuit in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2nd Cir.1987) (per curiam). In *Garrett v. N.H. Higher Educ. Assistance Foundation*, 180 B.R. 358 (Bankr.D.N.H.1995), Judge Vaughn articulated the test as requiring the following showing:

1. That the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loans;

2. That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

3. That the debtor has made good faith efforts to repay the loans.

*See id.* at 362. This Court adopts this test in applying § 523(a)(8).[8]

■ The Court finds that the Debtor has satisfied the first and third factors of the *Brunner* test with respect to each individual obligation in question. To satisfy the first factor, the Debtor must show that payment of the loan in question would "cause her standard of living to fall below that which is minimally necessary." *Id.* at 363. The Court finds that the Debtor has made such a showing with respect to each of her 15 loan obligations. To be frank, the Debtor's financial situation, as it stands today, is distressing. Her Schedules I and J show a negative monthly cash flow equal to $38.76, stemming from a paltry monthly income of $863.49. The Debtor lives with her parents rent-free and lives what can only be described as a frugal lifestyle. The Debtor already exists at a minimal level without the burden of any of the relevant loans. Accordingly, forcing the Debtor to pay any of the 15 loans, based on her current financial condition, would cause her standard of living to fall below what is minimally necessary.

■ To satisfy the third factor, the Debtor must show that she has made a good faith effort to repay the loans. The Court finds that the Debtor has done so

finds that the hybrid approach appropriately harmonizes the two opinions.

**8.** The Debtor argues that instead of the *Brunner* test, this Court should adopt the "totality of the circumstances" test as expressed by Judge Haines in *Kopf v. U.S. Dept. of Educ. (In re Kopf)*, 245 B.R. 731 (Bankr.D.Me.2000). The Court declines the Debtor's invitation for two reasons. First, the Court views both tests as similar insofar that the totality of the cir-

cumstances test in application looks to similar factors as found in the *Brunner* test, but that the *Brunner* test creates more certainty and predictability by establishing concrete factors. Second, absent a countervailing reason, this Court strives to create uniformity within this district in an effort to foster predictability and avoid the unseemliness that flows from outcomes being dependent on the random assignment of a case to a judge.

with respect to each loan. Although the Debtor's payments on the loans have been few and intermittent, it appears that she has devoted any additional income to paying such loans. The sporadic nature of her payments flows from the fact that additional income has been scarce. Moreover, the Debtor introduced substantial evidence indicating that she has made significant efforts in seeking a restructuring of her loans to accommodate her meager resources. *See* Debtor's Exs. 3, 3–a, 4–a, and 6. The Court finds that the Debtor has made a good faith effort to repay each loan in question.

■■■■■ The problematic nature of the instant inquiry flows from the second factor of the *Brunner* test. To satisfy that factor, the Debtor must show that "she will be unable to make the payments on the student loans in the future." *Garrett*, 180 B.R. at 363. In other words, the Debtor must show that her current financial incapability will continue for the foreseeable future. The Court sees one significant obstacle in reaching such a conclusion. A debtor cannot satisfy the second prong of the *Brunner* test when his or her financial distress is self-imposed. *Cf. Holzer v. Wachovia Serv., Inc.*, 33 B.R. 627, 631 (Bankr. S.D.N.Y.1983) ("However, where the Court determines that the debtor's predicament is self-imposed, a presumption against discharge arises."); *Price v. United States (In re Price)*, 1 B.R. 768, 769 (Bankr.D.Hawaii 1980). Testimony at trial revealed that the Debtor has confined her job search to the art field, a field that appears to offer relatively little in the way of opportunities and compensation. The Debtor, however, has experience in office administration and secretarial work, fields that presumably offer more with respect to stable work and earnings. In other words, it appears that the Debtor is voluntarily underemploying

herself, a circumstance that cuts against *Brunner's* second prong. The Court recognizes that the Debtor desires to be employed in the field that she has been trained in, a field that appears to be her passion. However, when circumstances foreclose such a possibility, a debtor does not have the luxury of remaining underemployed when saddled with debt that created the opportunity. In essence, the Debtor took a voluntary chance in incurring significant debt in seeking an art career. Unfortunately, for the time being at least, the chance has not paid off.[9]

Although the Court finds that the Debtor's underemployment cuts against *Brunner's* second prong, a mitigating circumstance exists. The Debtor is 50 years old. ECMC has proposed repayment terms stretching over the next 30 years. In other words, under ECMC's proposal, the Debtor would be required to make payments, and therefore work, until she is 80 years old. The Court finds such a situation unreasonable. *See Brown v. Union Fin. Serv., Inc. (In re Brown)*, 249 B.R. 525, 528 (Bankr.W.D.Mo.2000) ("Requiring someone to repay a student loan under a repayment schedule that far exceeds one's average working life imposes an undue hardship on the debtor."). Presumably, the Debtor's productive working life will continue until she is 65 years old. Accordingly, a 15 year repayment term appears reasonable to the Court. The question becomes, therefore, what should the monthly payments be during such a term? This question turns on the Debtor's potential income assuming she fully employs herself. The Debtor's current monthly net income equals $863.49, or $10,361.88 annually. The Court assumes that if the Debtor fully employed herself in a secretarial or administrative capacity, her monthly net income would equal at least

---

9. The Court notes that although the Debtor's art education has not resulted in monetary success, her education has presumably yielded significant intrinsic satisfaction and personal development, and therefore a substantial *quid pro quo* worthy of repayment.

twice that amount, or $1,726.98. The Debtor holds both bachelors and masters degrees, and appears to be intelligent and articulate. The Court does not doubt that she could easily double her current income in the general workforce. The Debtor testified at trial that she will likely be forced to move out of her parents' home in the near future, and therefore incur rental expenses. The Debtor did not estimate such expenses. Accordingly, the Court estimates that such expenses would equal roughly $600.00 per month. Adding that expense to the Debtor's current monthly expenses of $902.25 yields an anticipated monthly expense figure equal to $1,502.25. Reconciling that number with the projected monthly income figure of $1,726.98 yields net monthly income equal to $224.73.[10] Accordingly, the Court finds that the Debtor is capable of paying $224.00 per month for the next 15 years with respect to the instant obligations without undue hardship. The question becomes, therefore, which loans, on a cumulative basis, the Debtor is capable of paying. The Court finds such loans nondischargeable pursuant to § 523(a)(8) and any remaining loans not capable of being paid pursuant to this analysis dischargeable as an undue hardship pursuant to § 523(a)(8).

## D. Determining Which Loans are Dischargeable

■ Given this Court's conclusion that it would not be an undue hardship for the Debtor to repay her student loans according to a repayment schedule of $224.00 per month for 15 years, the question arises as to how such a conclusion should be applied to the 15 debts at issue. Although ECMC has submitted copies of the underlying notes, there is no evidence in the record indicating the payment terms of each of the 15 loans. Accordingly, the Court is unable to determine which loans the Debtor is capable of paying pursuant to its findings. The Court, pursuant to a separate order, shall require the parties to submit further information regarding the underlying notes so that it may determine which loans are nondischargeable pursuant to § 523(a)(8).

The Court believes that the method used for selecting loans to be excepted from discharge under the hybrid approach should be objectively neutral among the various loans and lenders and should further the Congressional intent behind § 523(a)(8) in maximizing the repayment of the Debtor's student loans short of imposing an undue hardship. In an effort to maximize the repayment of the Debtor's educational loans, the Court shall analyze each loan in chronological order, with the oldest loan being analyzed first. If a loan may be paid within the next 15 years given a beginning monthly payment equal to no more than $224.00, it shall be excepted from discharge, the $224.00 limit on loan payments shall be reduced and the next loan shall be considered in the same manner at the reduced payment limit. If it is determined that a loan cannot be fully repaid within 15 years according to this analysis, and is therefore dischargeable, then the next chronological loan shall be subject to the same analysis until no more loans can be fully repaid. The Court notes that in this case no evidence or legal arguments were presented to support the treatment of one or more loans in preference to any other loan. Accordingly, the Court need not decide what facts and circumstances, if any, would justify reviewing the loans in other than chronological order.

## III. CONCLUSION

For the reasons stated above, the Court finds the instant loans nondis-

---

**10.** Interestingly, this figure is very close to the $200.00 per month the Debtor had indicated she is willing to pay over the next ten years in satisfaction of the instant obligations. *See* Debtor's Final Pretrial Statement, at ¶ 8.

chargeable pursuant to § 523(a)(8) to the extent each loan, on a cumulative basis, can be paid according to a repayment plan reflecting an aggregate monthly payment of not more than $224.00 over 15 years. Any of the 15 loans that cannot be paid according to such a repayment plan are an undue hardship and therefore dischargeable pursuant to § 523(a)(8). The Court shall issue a separate order specifying what further information shall be filed by the parties so that the Court may conduct the above analysis.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.