In re MCGINNIS, Sarah P., Debtor.

McGinnis, Sarah P., Plaintiff,

v.

Pennsylvania Higher Education Assistance Agency, Defendant.

Bankruptcy No. 02–70055. Adversary No. 02–7004.

United States Bankruptcy Court, M.D. Georgia, Valdosta Division.

Feb. 14, 2003.

R. David Bryan, Tifton, GA, for debtor.

David E. Mullis, Valdosta, GA, for plaintiff.

Shayna M. Steinfeld, Atlanta, GA, for defendant.

## MEMORANDUM OPINION

JOHN T. LANEY, III, Bankruptcy Judge.

On January 29, 2003, the court conducted a trial on the Complaint of Sarah P. McGinnis ("Plaintiff") Against Pennsylvania Higher Education Assistance Agency ("Defendant") for determination of wheth- er her student loan debt is dischargeable as an undue hardship under 11 U.S.C. § 523(a)(8). At the conclusion of trial, the Court took the matter under advisement. After considering the evidence, the parties' stipulations and arguments, as well as the applicable statutory and case law, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

While the parties do not dispute the basic underlying facts, the two sides differ vastly on the issue of whether Plaintiff's financial situation will improve in the fu- ture and to what extent. Other than stipu- lated documents, the only other admitted evidence is Plaintiff's largely uncontrovert- ed testimony. (*See* Pl.'s Exs. 2 & 3, Def.'s Exs. 1–9).

Plaintiff received a college degree in music history from Birmingham–Southern College in 1974. (*See* Def.'s Ex. 7). Plain- tiff testified that her degree was conferred in May 1974 but she did not attend classes after August 1973. According to Plaintiff's testimony, this type of degree is only use- ful if masters and doctorate degrees are attained, which would enable one to teach at the college level. Plaintiff stated that she is not a musician nor can she teach any type of music or musical instrument les- sons. Plaintiff was conditionally accepted into a music history masters program in Texas in 1974, pending her achievement of state resident status. However, Plaintiff testified that she left Texas just months after moving there, during which time she worked at a business machine company answering the telephone.

Plaintiff returned home to Alabama from Texas to be with her now ex-hus- band, Ken Mory. After marrying in August 1974, Plaintiff worked in a department store, starting as a clerk with the hope of becoming a buyer. However, the busy holiday sales season prevented her from training as a buyer. She left the depart-

ment store after the holiday season and began working for the telephone company. At the telephone company, Plaintiff worked in customer service and in human resources. (*See id.*).

Plaintiff left the full-time work force in June 1978 to raise the first of her two children. (*See also id.*). Besides child rearing, Plaintiff testified that she participated in a number of volunteer positions. Additionally, after the split up of the telephone company, Plaintiff did work at AT & T retail stores on a part-time basis when her children were older.

In 1982, Plaintiff and her family moved to Austin, Texas, so her husband could work on his Ph.D. Plaintiff testified that she worked while her husband was in school but did not state whether it was on a full-time or part-time basis. Following their time in Austin, Plaintiff and her family moved to Atlanta after her husband received a job offer with BellSouth. In August 1990, Plaintiff and her family moved to Australia, when her husband was transferred there by BellSouth. After only two months in Australia, Plaintiff's husband asked her for a divorce. Plaintiff remained in Australia for a few months then returned to Atlanta with the children, who were eleven and nine at the time.

According to Plaintiff's testimony, upon returning to Atlanta in 1991, she began to search for employment opportunities. Being nearly 40 at the time, Plaintiff testified that she found it difficult to find a sales position. Plaintiff desired a position that could support her through the age of 65. Plaintiff stated that she was good with language skills and thought that court reporting might be a good option for her. Approximately six months after returning from Australia, Plaintiff began classes at

Brown College of Court Reporting to receive training as a court reporter. Knowing what she does now, Plaintiff admits that she should have done more research before pursuing court reporting as a career. During her years at Brown College, Plaintiff received the loans at issue here.

Plaintiff testified that she attended Brown until December 1995 on a full-time basis. In January 1996, Plaintiff moved to Tifton, Georgia and began working under a judicial permit as a court reporter. (*See also id.*; Pl.'s Ex. 3). Plaintiff testified that she felt it was necessary to take the position in Tifton because progress on getting her certification had been slow and she needed to leave Atlanta due to the high cost of living. Plaintiff continued to attend Brown on a part-time basis through March 1996, driving to Atlanta two nights a week. Plaintiff testified that she finally quit going to Brown all together because she could not maintain the work and school schedule. Plaintiff did not graduate from Brown College of Court Reporting. (*See* Def.'s Ex. 7).

To maintain her judicial permit, Plaintiff was required to take the Georgia court reporter exam each time it was offered.[1] (*See* Pl.'s Ex. 2). Additionally, Plaintiff had begun taking the exam, with the hope of passing it and becoming fully certified, as early as September 1994, when she passed one of the four sections. (*See id.*). Between September 1994 and 2001, Plaintiff was unsuccessful at passing the exam in its entirety. (*See id.*). Plaintiff testified that she took the exam every time it was offered except for April 1995, when her daughter had caused Plaintiff to be evicted from her apartment, and September 1998, shortly after she had been strick-

---

1. The exam was offered two times a year, April and September according to Plaintiff's testimony. However, Plaintiff's Ex. 2 indi-cates that the test was offered in March, not April.

en with Guillain–Barré syndrome ("Guillain–Barré") and Bells Palsy. (*See also id.*).

Plaintiff testified that her bout with Guillain–Barré left her almost completely paralyzed at its worst stage. Plaintiff had Bells Palsey on both sides of her face. Plaintiff testified that she spent three to four weeks in Augusta at Georgia Medical College awaiting diagnosis and initial treatments. (*See also* Def.'s Ex. 3)(Plaintiff's bankruptcy petition does show a high level of medical-related debt, which has been discharged). After extensive therapy to retrain nearly all of her muscles and to relearn all of her skills, including simple tasks such as holding a spoon, Plaintiff testified that she returned to work in November 1998. However, Plaintiff stated that she was not at full strength and able to sit through long court hearings until March 1999. According to Plaintiff's testimony, lingering effects of her bout with Guillain–Barré include troubles with her feet, including nerve damage and swelling, and chronic upper back pain. Plaintiff testified that she cannot sit for extended amounts of time without getting up and moving around because of the chronic upper back pain.

From January 1996 to April 2001, Plaintiff was able to continue working as a court reporter in Tift County under her judicial permit. (*See* Def.'s Ex. 7; Pl.'s Ex. 3). However, the state of Georgia eliminated judicial permits in 2001, offering only a one-time, one-year extension. (*See* Pl.'s Ex. 3). Plaintiff testified that she attempted the national court reporter exam in May 2001 but did not pass it. After expending many years and quite a bit of money on school and exam fees, Plaintiff decided to give up on her pursuit of becoming a fully-certified court reporter. Plaintiff declined to use her one-time, one-year extension. (*See Id.*).

Plaintiff testified that she realized she needed to move on and attempt a new career. She tried landscaping, doing detail work, such as planting flowers, as a sub-contractor for businesses and some personal residences. (*See* Def.'s Ex. 7). Plaintiff found it difficult to establish herself in the business because it required high overhead expenses and was physically draining. Plaintiff testified that she felt trapped in a catch–22 situation because the areas that had a low cost of living, such as Tifton, did not provide enough work for her to support herself. However, in the areas that would have enough work for her, such as Atlanta, the living expenses were too high.

During 2002, to supplement her income from her landscaping business, Plaintiff testified that she attempted to get a job at Lowe's, Wal–Mart, and Tift General Hospital. She received little to no interest from these employers. She did have two offers: 1)Affinity—transcriptionist, 30 hours a week at six dollars an hour; 2) ABAC—tutor in Irwin County, 18 hours a week for $832 per month, funding for the program was in the fourth year of a five-year grant. Plaintiff testified that she found no job advertisements in the Tifton newspaper. Plaintiff tried temporary employment agencies, where she received only the offer from Affinity. Plaintiff admits she did not at that time try to look for employment outside the Tifton area.

Plaintiff described her landscaping business as sporadic during 2002. In addition to the lack of available work, Plaintiff's truck lease ended and her request to release it was denied. Plaintiff was able to purchase a 1982 Delta 88 for $2,500, but she was unable to haul much of her landscaping equipment around in the car. Plaintiff testified that she had to put an additional $2,000 in repairs into the car during 2002. By the end of 2002, Plaintiff

testified that she felt as if she had no job prospects in Tifton. Therefore, Plaintiff sold all of her possessions except for what she could fit in her car and moved to Bakersfield, California in January 2003. Plaintiff testified that she is currently residing with her daughter until she can get on her feet again.

In 1999, while working as a court reporter under the judicial permit, according to her tax records, Plaintiff had an adjusted gross income of $25,218. (*See* Def.'s Ex. 4). In 2000, according to her tax records, Plaintiff had an adjusted gross income of $21,341. (*See* Def.'s Ex. 5). In 2001, the year her judicial permit was terminated, Plaintiff's tax records indicate that her adjusted gross income had slipped to $8,169. (*See* Def.'s Ex. 6). In 2002, Plaintiff netted approximately $5,700 from her landscaping business. Additionally, she received $4,500 from a grant, which has since lost funding, and $5,600 from finishing up a backlog of court reporting work, which she was allowed to complete after her judicial permit was eliminated. (*See* Pl.'s Ex. 3). Plaintiff testified that the $10,170 of additional deposits into her bank account during 2002 were gifts from her family and charity money from a friend of her family who also assisted her in 1998 when she had her bout with Guillain–Barré. (*See* Def.'s Ex. 8).

When questioned about other forms of income such as alimony, Plaintiff testified that during her divorce proceedings she was unrepresented. As part of the divorce, Plaintiff did receive a cash settlement somewhere between $20,000 and $25,000. One year after the divorce was final, Plaintiff testified that she agreed to receive only child support payments under the assumption that she would retain custody of the children. However, she began to have troubles with both of her children and by the spring of 1995 neither child

resided with her. Plaintiff's ex-husband continued to send her money for several months after her daughter moved out but eventually stopped.

When questioned about her inability to pass the court reporter exam, Plaintiff testified that she did not believe it was entirely attributable to her bout with Guillain–Barré. While her illness forced her to miss one exam and to relearn her court reporting skills for a second time, Plaintiff attributes her overall inability to pass the court reporter exam to changing exam standards and difficult testing environments. Throughout her many attempts, Plaintiff did in actuality pass all four parts of the exam but not in any combination and/or timing that allowed her to become certified. (*See* Pl.'s Ex. 2).

Plaintiff testified that the certification board changed the standards, such as time requirements, almost on a yearly basis, giving Plaintiff and other test takers a moving target to attain. Additionally, Plaintiff testified that the certification board constantly changed their policy regarding which parts of the exam did not have to be retaken if it had been passed previously. Further, Plaintiff testified that on multiple occasions the exams where interrupted or delayed due to technical difficulties. During one particular exam, an alarm sounded for several minutes but no announcement was made as to whether exam participants should leave the area or stay in their seats. Plaintiff testified that she did seek legal advice about challenging the certification board but was led to believe that it was not worth pursuing her claim.

Regarding her current and future employment situation in California, Plaintiff testified that she was able to quickly attain temporary employment in California at Jackson Hewitt, a tax preparer service. The employment is scheduled to end April

15, 2003 and will pay minimum wage plus a 5% commission on each tax return she prepares.

Plaintiff testified that she is living expense free right now at her daughter's home. However, Plaintiff stated that she will need to contribute towards her living expenses as soon as possible. Additionally, Plaintiff testified that she and her daughter have previously had a strained relationship, which led to the daughter's leaving Plaintiff's home to live with her father. Recently, the two have reconciled. Keeping in mind their history, Plaintiff testified that she would like to move out of her daughter's home as soon as possible, in efforts to not stress the newly reconciled relationship.

Plaintiff testified that she moved to California because she believed that her job opportunities would be better. However, she has found that belief not to be true. While she believes that her skills, such as communication, transcription, Internet research, and typing, are valuable skills, Plaintiff testified that she has not received any job offers for a permanent position that pays more than minimum wage. Plaintiff added that, while she was familiar enough with computers to use the court reporting software, she is unfamiliar with Microsoft Office, an extremely common software package.

Despite sales experience from the 1970's and 1980's and some basic administrative skills, Plaintiff believes that her age, which is now 50, has played and will continue to play a significant factor in her inability to find permanent full-time, above minimum wage employment. Plaintiff testified that she knows it is illegal for companies to discriminate against her because of her age. However, it is Plaintiff's testimony that employers have not called her back when she has submitted an application.

Plaintiff testified that she could not pick back up with either the court reporting or the landscaping because she would run into the same problems in California that she did in Georgia. Additionally, the high costs of getting the equipment Plaintiff would need to get started again act as an additional barrier. Plaintiff testified that she had only $150 in her checking account and $20 in her pocket for funds to pursue any type of self-employment opportunity, such as home selling. Additionally, Plaintiff testified that the 15% self-employment tax was a deterrent to any type of self-employment.

For court reporting, Plaintiff testified that she would need approximately $6,000 to purchase the machine and software necessary to begin again. Beyond money, Plaintiff explained that her skills have slipped because she has not been doing that type of work for almost two years. Further, Plaintiff testified that she believes California's requirements to pass the court reporter exam are even higher than Georgia's. Plaintiff stated that some states do not have court reporter exams. However, according to Plaintiff's testimony, states that do not have exams only hire court reporters that have passed the national exam or another state's exam. Additionally, Plaintiff testified that she has been told by an eye doctor that she is showing signs of glaucoma, which can lead to complete blindness if left untreated. Plaintiff has been unable to seek treatment because she has not had any type of medical insurance and cannot afford to pay for treatment out of pocket.

As far as landscaping, Plaintiff testified that she would have to repurchase many of her tools that she had sold prior to moving to California. Plaintiff currently lacks the funds to do so. Additionally, Plaintiff believes that California may require a li-

cense, as they do for many types of businesses.

Plaintiff also discussed her inability to continue on with her music history education. Plaintiff testified that it does not make sense to her to pursue additional education because she would only acquire more debt. Additionally, Plaintiff testified that after so many years, she would have to start over and complete another undergraduate degree before she could begin any type of advanced degree in the music history field.

In regards to public assistance, Plaintiff testified that she attempted to sign up for Medicare but was laughed at. Plaintiff was led to believe that a person must be completely disabled before they would qualify for such programs. Other than Medicare, Plaintiff has not sought any type of public assistance and hoped not to. However, if her situation does not improve, Plaintiff testified that she is going to be forced to apply for some type of assistance.

In regard to the student loans, the parties stipulated that the total amount owned is $55,196.00. Plaintiff testified that she had consolidated the loans previously. (*See* Def.'s Ex. 2). When questioned about refinancing the student loans at a lower interest rate, Plaintiff testified that because of her bad credit and bankruptcy, she would be unable to take advantage of today's low interest rates. In reviewing Plaintiff's payment history, Plaintiff conceded that she had been in forbearance most of the time after 1996, with the exception of a six-month period beginning September 2000 and ending February 2001. During that six-month period, Plaintiff testified that she paid five of the six payments that came due. According to Defendant's Exhibit 1, which has been stipulated to, only four payments were recorded as received. (*See* Def.'s Ex. 1).

However, one payment is double the amount of the other payments. (*Id.*). In essence, five payments were received during the six-month time period.

## CONCLUSIONS OF LAW

■ As stated in the unpublished Memorandum Opinion issued for the Motion for Summary Judgment in this same case, under 11 U.S.C. § 523(a)(8), Plaintiff's student loans are nondischargeable unless Plaintiff can prove that repayment of the loans would subject her to an undue hardship. 11 U.S.C. § 523(a)(8) (1993 & Supp. 2002); *McGinnis v. Pennsylvania Higher Educ. Assistance Agency (In re McGinnis)*, No. 02–70055 A.P. 02–7004, 2002 WL 31966454, (Bankr.M.D.Ga. Dec.20, 2002) (J. Laney). The term "undue hardship" is not defined in the Federal Bankruptcy Code ("Code"). *See* 11 U.S.C. §§ 101, 523 (1993 & Supp.2002). Therefore, the term has been analyzed by many courts, leading to several different tests to determine "undue hardship." *See Brunner v. New York State Higher Educ. Serv. Corp. (In re Brunner)*, 831 F.2d 395, 396–397 (2d Cir. 1987) (Brunner three-prong test); *Andrews v. South Dakota Student Loan Ass'n Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir.1981) (totality of the circumstances test); *Bryant v. Pennsylvania Higher Educ. Assistance Agency (In re Bryant)*, 72 B.R. 913, 916–917 (Bankr. E.D.Pa.1987) (poverty test, superseded by statute on other grounds).

■ As spelled out in *Brunner*, the three-prong test is as follows: 1) under his/her current financial situation the debtor would not be able to afford a minimal standard of living if forced to repay the student loans; 2) the inability to maintain a minimal standard of living if forced to repay the student loans is likely to continue for a majority of the repayment period; and 3) debtor must have made a good faith

effort towards repayment. *Brunner*, 831 F.2d at 396. This test is widely accepted, including by courts in this circuit and this district. *See Brightful v. Pennsylvania Higher Educ. Assistance Agency (In re Brightful)*, 267 F.3d 324, 327–331 (3d Cir. 2001); *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1111–1112 (9th Cir.1998); *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 437 (6th Cir.1998) (considered but not adopted); *In re Roberson*, 999 F.2d 1132, 1134–1138 (7th Cir.1993); *Educational Credit Management Corp. v. Carter (In re Carter)*, 279 B.R. 872, 875–879 (M.D.Ga.2002); *Gerhardt v. Southwest Student Serv. Corp. (In re Gerhardt)*, 276 B.R. 424, 430 (Bankr.E.D.La.2002); *Illinois Student Assistance Comm'n v. Cox*, 273 B.R. 719, 722–723 (N.D.Ga.2002); *Wynn v. Missouri Coordinating Board of Educ. (In re Wynn)*, 270 B.R. 799, 803 (Bankr.S.D.Ga.2001); *Vermont Student Assistance Corp. v. Coulson (In re Coulson)*, 253 B.R. 174, 177 (W.D.N.C.2000); *Grigas v. Sallie Mae Serv. Corp. (In re Grigas)*, 252 B.R. 866, 874 (Bankr.D.N.H. 2000); *Hollister v. University of N.D. (In re Hollister)*, 247 B.R. 485, 490 (Bankr. W.D.Okla.2000).

■ A district court in this district adopted the *Brunner* test in the *Carter* case. *Carter*, 279 B.R. at 875–876. The court set a very high standard for what is to be considered an "undue hardship." *See id.* at 877–879. Further, under *Carter*, a partial discharge is not allowed. *Id.* at 877–878. While it can be argued that the *Carter* decision is not directly binding on this Court, it will be given a great deal of weight in analyzing the term "undue hardship." *See First of America Bank v. Gaylor (In re Gaylor)*, 123 B.R. 236, 241 (Bankr.E.D.Mich.1991), *but see Wright v. Transamerica Fin. Serv., Inc. (In re Wright)*, 144 B.R. 943, 949 (Bankr.S.D.Ga.

1992). Therefore, this Court takes the position that, under *Carter*, the *Brunner* test is the appropriate analysis to use and that Plaintiff's debt is either entirely dischargeable or entirely nondischargeable.

Defendant concedes that Plaintiff has satisfied the first prong of the *Brunner* test, agreeing that Plaintiff currently would lack the ability to afford a minimal standard of living if forced to repay her student loan debt. *Brunner*, 831 F.2d at 396. However, Defendant contends that Plaintiff has failed to carry her burden on the second and third prongs of the *Brunner* test. *Id.* Defendant contends that Plaintiff's situation is not likely to remain the same once she gets on her feet again. Finally, Defendant argues that Plaintiff has not made a good faith effort towards repayment.

■ Regarding the second prong of the *Brunner* test, Defendant urges the Court to take an approach that has been adopted by other courts in which poverty standards are taken into consideration. *See Ledbetter v. United States Dep't of Educ. (In re Ledbetter)*, 254 B.R. 714, 716 (Bankr. S.D.Ohio 2000). However, this Court declines to adopt such an approach. *Brunner* does question whether a debtor can repay the student loans and still maintain a "minimal standard of living." *Brunner*, 831 F.2d at 396. However, this does not mean Plaintiff must live at or below the poverty level for the remainder of the repayment period to prove an undue hardship. *See also Mayer v. Pennsylvania Higher Educ. Assistance Agency (In re Mayer)*, 198 B.R. 116, 125 (Bankr.E.D.Pa. 1996), *aff'd* 156 F.3d 1225 (3d Cir.1998) (living at poverty level should not be considered necessary to satisfy the *Brunner* test).

■ According to the court's analysis in *Carter*, Plaintiff's future situation must have a "certainty of hopelessness, not sim-

ply a present inability to fulfill financial obligations." *Carter,* 279 B.R. at 877 (quoting *Roberson,* 999 F.2d at 1136). As the court in *Carter* points out, meeting "this standard is not easy." *Id.* at 877 (quoting *In re Mallinckrodt,* 274 B.R. 560, 564 (S.D.Fla.2002)).

In *Carter,* the court found that the debtor, who was 39, despite her current unemployed status, had no "impediments" to future employment. *Id.* at 874, 878. Additionally, the court found that the debtor had "no major disabilities" which might interfere with her ability to work. *Id.* at 878. Further, the court pointed out that the debtor had graduated with a business administration degree from the University of Georgia and had prior job experience in that area. *See id.* The debtor in *Carter* graduated from the University of Georgia in 1990. *Id.* at 874.

■ Here, Plaintiff, the debtor, is 50. Plaintiff suffers from chronic upper back pain and is showing signs of the beginning stages of glaucoma. While Plaintiff has a college degree, she received the degree in 1974 in music history. Plaintiff's unrefuted testimony was that this degree is useless to her unless she returns to school for advanced degrees, which would only create more debt for her. The debtor in *Carter* had an ten extra years to be in the work force and a relatively current degree in the versatile area of business administration. *Id.* at 874, 878. Here, Plaintiff has neither of these things going for her. While age cannot be used to discriminate against Plaintiff either in hiring practices or granting of student loans, it would be foolish to ignore the effect her age will have, not only on her job prospects, but also on the number of years that she will be able to remain in the work force.

As a court reporter, Plaintiff has had a "total foreclosure of job prospects in her area of training." *Id.* at 878 (quoting *Ca-dle Co. v. Webb (In re Webb),* 132 B.R. 199, 203 (Bankr.M.D.Fla.1991)). Plaintiff was unable to pass the court reporter exam, despite approximately a dozen tries. Further, the state of Georgia licensing committee revoked her judicial permit in 2001 when they eliminated judicial permits entirely, offering only a one-time one-year extension.

This total foreclosure was beyond Plaintiff's control. If nothing else, Plaintiff certainly tried very hard to become a certified court reporter. The Court gives credit to Plaintiff for her tenacity at continuing to try to pass the court reporter exam. Certainly many others would have given up sooner than Plaintiff did. Plaintiff's only means of continuing as a court reporter was taken away from her in 2001 when the state of Georgia revoked all judicial permits. Certainly Plaintiff could have asked for the one-time, one-year extension but it would have only gotten her to April 2002.

Plaintiff testified that she has attempted to find other types of employment including retail sales, tutoring, tax preparation, and medical transcribing. However, if Plaintiff was even lucky enough to receive a response from the employer, none of the positions offered her permanent full-time work above minimum wage. Further, Plaintiff testified that she tried her own business but was not successful. Because of the tough times she faced recently, Plaintiff lacks the necessary equipment and/or funds to start her own business at this point in time. Because of her poor job prospects and poor credit, Plaintiff most likely will not have the type of capital or credit necessary in the next 10 to 15 years to start a business that would produce the amount of money required to repay her student loans and meet her basic living expenses.

The Court has taken into consideration that the overall U.S. economy is currently in a downturn. However, the Court does not believe that an economic upswing will bring Plaintiff the type of job prospects she would need to have to give her the ability to repay these student loans within the repayment period. Plaintiff will reach retirement age in 15 to 20 years. A repayment period stretching into her 70's and 80's is unthinkable. Even if it were to happen, Plaintiff's monthly payment would exceed $400 per month for thirty years.

The Court believes Plaintiff is accurate in her belief that it would be difficult for her to refinance her student loans to take advantage of today's low interest rates because of her poor credit history and her current bankruptcy. Plaintiff's bankruptcy will not be removed from her credit history for a minimum of seven years. This difficulty will not soon pass.

In regards to the good faith prong of the *Brunner* test, Defendant argues Plaintiff has only made four payments on the student loans. Plaintiff conceded that she had only been in repayment for a total of six months since 1996. As stated above in the findings of fact, Plaintiff did in effect make five of the six payments due during that time period. During the rest of the time from 1996 until the present, Plaintiff has received forbearances and hardships, granted by Defendant. Certainly it is not bad faith for Plaintiff to ask for and receive forbearances. Plaintiff was exercising her legal rights to request the forbearances. Plaintiff should not be punished for exercising her legal rights. Nor should Defendant be rewarded by saying it was bad faith on Plaintiff's part when Defendant allowed Plaintiff these breaks from repayment.

Actual payments are not necessary to show good faith. *See Mallinckrodt,* 274 B.R. at 568. Good faith can be shown by a debtor's effort to get a job, maximize income, and minimize expenses. *Id.* Surely no one will say that Plaintiff did not try hard to get a job as a court reporter. Plaintiff tried repeatedly to pass the court reporter exam. When that source of income was taken away from her, Plaintiff tried her own business, as well as tried to supplement her income by applying for positions at retailers such as Lowe's. Further, one cannot say that Plaintiff has lived extravagantly, or even comfortably. Plaintiff drives a 21–year old car and has no health insurance.

### *CONCLUSION*

The employment world has been none too friendly to Plaintiff in the past two years. Nor does it appear that Plaintiff will have much luck in the future. The Court does not look down upon Plaintiff for staying at home with her children during what could have been her most profitable and developmental years in the work force. Certainly this is a noble decision that women, and men for that matter, make every day. Upon reentering the work force, Plaintiff attempted a career that could have paid off the debt she incurred at Brown. However, changing test standards and difficult testing environments, as well as the revocation of her judicial permit, have wiped out Plaintiff's best efforts.

There is no question that Plaintiff's current financial situation would create an undue hardship if she was forced to repay her student loans. Plaintiff currently cannot find permanent full-time employment that pays over minimum wage. Based on the evidence before the Court, the Court does not believe that Plaintiff will ever be able to make more than minimum wage in the future. For Plaintiff, there has been a "total foreclosure of job prospects in her area of training" leading to a "certainty of

hopelessness" when it comes to meeting her basic needs, let alone repaying her student loans. *Roberson,* 999 F.2d at 1136; *Webb,* 132 B.R. at 202. Plaintiff has displayed good faith by paying five of the six payments that have actually come due, as well as making a valiant effort to obtain employment, maximize her income, and minimize her expenses.

The Court finds that Plaintiff's age, medical condition, and skill level will prevent Plaintiff from ever attaining the income that would be necessary for her to repay her student loans over the repayment period and still be able meet her basic needs. The Court holds that it would be an undue hardship on Plaintiff if she were forced to repay her student loans. Therefore, Plaintiff's student loans, totaling $55,196.00, are dischargeable under 11 U.S.C. § 523(a)(8).

An order in accordance with this Memorandum Opinion will be entered.