# BATES *v.* UNITED STATES

No. 96–7185.   Argued October 7, 1997—Decided November 4, 1997

24

GINSBURG, J., delivered the opinion for a unanimous Court.

*C. Richard Oren,* by appointment of the Court, 520 U. S. 1114, argued the cause and filed briefs for petitioner.

*Lisa Schiavo Blatt* argued the cause for the United States. With her on the brief were *Acting Solicitor General Dellinger, Acting Assistant Attorney General Keeney, Deputy Solicitor General Dreeben,* and *Daniel S. Goodman.**

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the meaning of § 490(a) (Pub. L. 99–498), 100 Stat. 1491, as added, 20 U. S. C. § 1097(a) (1988 ed.), which declared it a felony "knowingly and willfully" to misapply student loan funds insured under Title IV of the Higher Education Act of 1965. The United States acknowledges that § 1097(a) demanded allegation and proof of the defendant's intentional conversion of loan funds to his own use or the use of a third party. The question presented is whether § 1097(a) demanded, in addition, allegation and proof that the defendant specifically intended to injure or defraud someone—either the United States as loan guarantor, as the District Court read the measure, or another. We hold, in accord with the Court of Appeals, that specific intent to injure or defraud someone, whether the United States or another, is not an element of the misapplication of funds proscribed by § 1097(a).

I

The indictment in this case, App. 2–12, alleged the following facts. James and Laurenda Jackson owned and operated

---

*Lisa B. Kemler* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging reversal.

Education America, Inc., a for-profit consulting and management firm for technical and vocational schools. In December 1986, the Jacksons acquired the Acme Institute of Technology, a not-for-profit technical school located in South Bend, Indiana, which offered associate degree programs in electronic engineering, and tool, die, and plastics mold design. After the acquisition, the Jacksons appointed Bates—then the vice president of Education America—to serve as treasurer of Acme's board of trustees.

On April 30, 1987, James Jackson, as president of Acme, signed a program participation agreement with the Department of Education that authorized the school to receive student loan checks through the Title IV federal Guaranteed Student Loan (GSL) program. See 20 U. S. C. § 1070 *et seq.* (1988 ed.).[1] Acme's participation hinged upon both its continued accreditation by an approved accrediting association and Jackson's promise to comply with all applicable statutes and regulations.

Under the GSL program, banks and other private institutions lent money to Acme students for tuition and other educational expenses. The Federal Government administered the program and guaranteed payment if a student borrower defaulted. Acme would receive a loan check directly from the lender, endorse the check, and credit the amount of the check against the student's tuition debt. If a GSL student withdrew from Acme before the term ended, the governing regulations, 34 CFR §§ 668.22 and 682.606 (1990), required Acme to return to the lender a portion of the loan proceeds, based upon how late in the term the student

---

[1] In 1992, Congress amended the GSL program and renamed it the Federal Family Education Loan Program. Higher Education Amendments of 1992, Pub. L. 102–325, § 411(a)(1), 106 Stat. 510. Because the indictment in this case concerns only pre-1992 conduct, we refer to the program as the GSL program.

withdrew and how much the student had paid at that point.[2] Refunds to the lender, the applicable regulation, §682.607, instructed, were to be made within a specified period (30 or 60 days) following the student's withdrawal. The lender would then deduct the refund from the amount that the student owed. If Acme did not refund the loans to the lender, the student—and if she defaulted, the Government—would remain liable for the full amount of the loan.

Around the end of 1987, pursuant to decisions made by the Jacksons and Bates, Acme initiated a pattern and practice of not making GSL refunds. On April 14, 1988, James Jackson sent a letter to Acme's director ordering him, effective the following month, to "tally [Acme's] receipts for the preceding month and remit a management fee of 10% of [the] total receipts to Education America, Inc." App. 4. The letter also told the director to pay the Jacksons a monthly salary. The letter further stated: "If the above creates a cash shortfall in your school, money will be loaned back to you to cover the shortfall." See *ibid.* Bates, serving as Acme's chief financial officer, permitted these fee and salary payments to take priority over the GSL refunds, and specifically instructed other Acme employees not to make the required GSL refunds. In late 1988 or early 1989, Education America officials ordered Acme to stop using a special bank account that segregated the unearned student-loaned tuition from the general account. Acme's former owners had used this special account to ensure that funds were always available for timely refunds to lenders.

By October 1988, Acme had amassed roughly $55,000 in unmade GSL refunds. Acme's financial aid director sent James Jackson a letter in January 1989 to draw Jackson's attention to the gravity of the unmade refunds, which then

---

[2] The Department of Education since has consolidated the requirements of §§668.22 and 682.606 into the current §668.22. See 59 Fed. Reg. 61211 (1994).

totaled $68,000. By March 1989, Acme's refund liability had grown to approximately $85,000. In a letter dated March 13, 1989, Bates, as Education America's vice president, released Acme's financial aid director from all responsibility concerning GSL refunds, as she had requested. The letter stated that unmade refunds were "solely the responsibility and decision of the corporate office." See *id.*, at 5.

In April 1989, the National Association of Trade and Technical Schools, a national accrediting association, conducted an on-site audit of Acme to determine whether it should continue to accredit the school. A month later, the Association reported to the Department of Education that Acme had "inadequately demonstrated its ability to make appropriate and timely refunds," and had "loaned substantial amounts of money to [James Jackson,] the chief trustee." The report also noted evidence that management fees had been "upstream[ed]" to Education America. See *ibid.* Acme subsequently lost its accreditation, and the Department of Education notified the school on April 7, 1990, that effective March 8, 1990, Acme was no longer eligible to participate in the GSL program. On June 5, 1990, Acme ceased operations. During Bates's tenure as Acme's chief financial officer, the school amassed $139,649 in unmade refunds, not including interest and certain special allowances.

On September 8, 1994, a federal grand jury indicted Bates on twelve counts of "knowingly and willfully misapply[ing]," *id.*, at 11, federally insured student loan funds between January 15, 1990, and June 15, 1990, in violation of 20 U. S. C. § 1097(a) (1988 ed.) and 18 U. S. C. § 2 (1988 ed.). On February 7, 1995, Bates filed a motion to dismiss the indictment. He argued, and the District Court agreed, that conviction under § 1097(a) for willful misapplication required an allegation of the defendant's "intent to injure or defraud the United States." 96 F. 3d 964, 967 (CA7 1996). Because the indictment lacked such an allegation, the District Court dismissed it.

On appeal, the Seventh Circuit vacated the District Court's judgment and reinstated the prosecution. 96 F. 3d 964 (1996). The Court of Appeals concluded that § 1097(a) required the Government to prove only that "the defendant misapplied—i. e., converted—Title IV funds and that he did so knowingly and willfully." *Id.*, at 970. The Seventh Circuit's decision conflicts with the Eleventh Circuit's decision in *United States* v. *Kammer*, 1 F. 3d 1161, 1165–1166 (1993), which held that § 1097(a) requires the Government to allege and prove that the defendant had an "intent to defraud" the United States. We granted certiorari to resolve this conflict, 519 U. S. 1108 (1997), and now affirm the Seventh Circuit's judgment.

## II

Our inquiry begins with the text of 20 U. S. C. § 1097(a) (1988 ed.). At the time of the offenses charged in the indictment, the measure provided in relevant part: "Any person who knowingly and willfully embezzles, misapplies, steals, or obtains by fraud, false statement, or forgery any funds, assets, or property provided or insured under this subchapter . . . shall be fined not more than $10,000 or imprisoned for not more than 5 years, or both."[3]

The text of § 1097(a) does not include an "intent to defraud" state of mind requirement, and we ordinarily resist reading words or elements into a statute that do not appear on its face. In contrast, § 1097(d), enacted at the same time as § 1097(a), makes it a felony "knowingly and willfully" to "destro[y] or concea[l] any record relating to the provision of assistance under [Title IV] *with intent to defraud the United States*" (emphasis added). As this Court has reiterated: "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intention-

---

[3] Higher Education Amendments of 1986, Pub. L. 99–498, § 490(a), 100 Stat. 1491.

ally and purposely in the disparate inclusion or exclusion.'" *Russello* v. *United States*, 464 U. S. 16, 23 (1983) (quoting *United States* v. *Wong Kim Bo*, 472 F. 2d 720, 722 (CA5 1972)).

Despite the contrasting language of §§ 1097(a) and (d), Bates urges that an "intent to defraud" is an essential, albeit unexpressed, element of the offenses charged against him. For this argument, Bates relies primarily upon the District Court's reasoning in this case. The District Court, like the Eleventh Circuit in *United States* v. *Kammer*, 1 F. 3d, at 1165, looked to decisions interpreting 18 U. S. C. § 656, which proscribes willful misapplication of bank funds. The Courts of Appeals unanimously agree that § 656 requires the Government to prove that the defendant acted with an intent to "injure or defraud" the bank or "deceive" a bank officer,[4] even though the statute, on its face, contains no such element.[5] In another case involving a different defendant named Bates, the Seventh Circuit explained why § 656 included an "intent to injure or defraud" element:

> "The current statutory language does not expressly require any proof of [fraudulent or injurious] intent.

---

[4] *United States* v. *Whitlock*, 663 F. 2d 1094, 1102 (CADC 1980); *United States* v. *Wester*, 90 F. 3d 592, 595 (CA1 1996); *United States* v. *Castiglia*, 894 F. 2d 533, 537 (CA2), cert. denied, 497 U. S. 1004 (1990); *United States* v. *Thomas*, 610 F. 2d 1166, 1174 (CA3 1979); *United States* v. *Duncan*, 598 F. 2d 839, 858 (CA4), cert. denied, 444 U. S. 871 (1979); *United States* v. *McCord*, 33 F. 3d 1434, 1448 (CA5 1994), cert. denied *sub nom. Haley* v. *United States*, 515 U. S. 1132 (1995); *United States* v. *Woods*, 877 F. 2d 477, 479 (CA6 1989); *United States* v. *Crabtree*, 979 F. 2d 1261, 1266 (CA7 1992), cert. denied, 510 U. S. 878 (1993); *United States* v. *Ness*, 665 F. 2d 248, 249 (CA8 1981); *United States* v. *Wolfswinkel*, 44 F. 3d 782, 786 (CA9 1995); *United States* v. *Evans*, 42 F. 3d 586, 589 (CA10 1994); *United States* v. *Morales*, 978 F. 2d 650, 652 (CA11 1992).

[5] Section 656 currently provides that any person "connected in any capacity with any Federal Reserve bank" or a related organization commits a felony if she "embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits" of the bank or related organization.

Originally the statute did require proof of intent to 'injure or defraud' the bank or 'deceive' a bank officer but these words were inadvertently dropped in the course of a technical revision of the criminal code. To avoid making every unauthorized loan by a bank officer a willful misapplication of bank funds, courts . . . read the missing words back into the section." *United States* v. *Bates*, 852 F. 2d 212, 215 (1988).

Assuming, without deciding, that the Seventh Circuit's reading of § 656 is correct, § 1097(a) never contained, as § 656 did, an "intent to defraud" requirement, a requirement present from the start and still contained in § 1097(d). In short, there is here neither text nor history warranting the construction of § 1097(a) that Bates urges us to adopt.[6]

Nor does § 1097(a) set a "trap for the unwary," as the Seventh Circuit suggested § 656 would if read to render felonious "every unauthorized loan by a bank officer." See *Bates*, 852 F. 2d, at 215. Under the Seventh Circuit's construction, § 1097(a) catches only the transgressor who intentionally exercises unauthorized dominion over federally insured student loan funds for his own benefit or for the benefit of a third party. "[I]nnocent . . . maladministration of a business enterprise" or a use of funds that is simply "unwise," see Brief for Petitioner 5, does not fit within that construction.[7]

---

[6] *Ratzlaf* v. *United States*, 510 U. S. 135 (1994), does not bear on our decision today. *Ratzlaf* decided only, in the particular statutory context of currency structuring, that knowledge of illegality was an element of 31 U. S. C. § 5322(a) as that provision was then framed. *Ratzlaf* did not involve the question presented here regarding § 1097(a), which is whether, *in addition* to a knowledge requirement, the Government must allege and prove an "intent to injure or defraud."

[7] The Seventh Circuit's "working definition" of § 1097(a) reads:

"[W]illful misapplication under § 1097(a) requires the government to allege and prove that the defendant consciously, voluntarily, and intentionally exercised unauthorized control or dominion over federally provided or guaranteed Title IV funds that interfered with the rights of the funds' true owner(s), for the use and benefit of the defendant or a third person,

Bates also relies on a 1992 amendment to § 1097(a), which added "fails to refund" to the provision's text.[8] This change, Bates argues, establishes that the deliberate failure to return GSL funds, without an intent to defraud, was not previously an offense within § 1097(a)'s compass, but became one only under the statute's current text. Congress' 1992 amendment hardly means that § 1097(a) did not previously cover the conduct in question. Cf. *Commissioner* v. *Estate of Sternberger*, 348 U. S. 187, 194 (1955) ("Subsequent amendments have clarified and not changed th[e earlier] principle."). The three added words—"fails to refund"—simply foreclose any argument that § 1097(a) does not reach the failure to make refunds; those words do not make the argument a persuasive one. See H. R. Conf. Rep. No. 102–630, p. 513 (1992) ("[F]ailure to pay refunds does constitute criminal misapplication under current law. Language is added in this bill merely as a clarification.").

Bates finally urges that, to the extent § 1097(a) is ambiguous, the rule of lenity supports interpretation of the provision to include fraudulent intent as an essential element of the offense of knowing and willful misapplication of funds. As we have explained, however, nothing in the text, struc-

---

while knowing that such an exercise of control or dominion over the funds was a violation of the law." 96 F. 3d, at 970.

The Government argues that the Seventh Circuit erred in reading § 1097(a) to require proof that a defendant knew his misapplication violated *the law.* Brief for United States 21–22. However, the Government did not challenge by cross-petition any part of the Seventh Circuit's decision, so the question whether the defendant must know his conduct was a violation of the law is not before us.

[8] As amended in 1992, § 1097(a) reads in relevant part:

"Any person who knowingly and willfully embezzles, misapplies, steals, obtains by fraud, false statement, or forgery, or fails to refund any funds, assets, or property provided or insured under this subchapter . . . shall be fined not more than $20,000 or imprisoned not more than 5 years, or both." Higher Education Amendments of 1992, Pub. L. 102–325, § 495, 106 Stat. 631.

ture, or history of § 1097(a) warrants importation of an "intent to defraud" requirement into the misapplication proscription. The rule of lenity, therefore, does not come into play. See *United States* v. *Wells*, 519 U. S. 482, 499 (1997). The Government need not charge or prove that Bates aimed to injure or defraud anyone, nor is it a defense that Bates hoped the Jacksons, the students, or someone else would pay the amount due the lenders so that the federal fisc would suffer no loss.

    &ast;  &ast;  &ast;

For the reasons stated, the judgment of the Court of Appeals for the Seventh Circuit is

*Affirmed.*