[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 13, 2001
THOMAS K. KAHN
CLERK

Nos. 00-15142 & 00-15751

_____

D. C. Docket No. 99-00204-CR-J-21C

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUDY WEAVER,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(November 13, 2001)**

Before ANDERSON, Chief Judge, HULL and FAY, Circuit Judges.

HULL, Circuit Judge:

Defendant Judy Weaver appeals her conviction and sentence for knowingly

and willfully aiding and abetting the failure of Flagler Career Institute to make

refunds of student loans and Pell Grant funds, in violation of 20 U.S.C. § 1097(a) and 18 U.S.C. § 2.  After review and oral argument, we affirm.

## I.  BACKGROUND

This appeal primarily concerns the district court's denial of Weaver's motion to withdraw her guilty plea.  We first review (a) Weaver's plea agreement, (b) her plea colloquy, and (c) the evidentiary hearing before the district court.

### A.    Plea Agreement

For about 10 years, Judy Weaver was the Director of Finance of Flagler Career Institute ("Flagler"), a proprietary school.[1]  When students dropped out or withdrew, Flagler was required to refund the proceeds of Pell Grants and student loans guaranteed by the Department of Education.  Weaver's duties included writing those refund checks.  On July 14, 1999, the government filed a one-count information charging that, beginning in early 1996 and continuing through February 1998, Weaver "did knowingly and willfully aid and abet Flagler's failure to make refunds on behalf of approximately 165 students in the amount of more than $120,000 but less than $200,000," in violation of 20 U.S.C. § 1097(a) and 18 U.S.C. § 2.

---

[1]Flagler was a wholly-owned subsidiary of Wangberg Enterprises, Inc., a corporation owned solely by Louis Wangberg.

Weaver entered into a plea agreement ("Agreement") wherein she acknowledged understanding the nature and elements of her offense. The Agreement listed these elements as (1) "[t]hat the defendant failed to refund student loans insured by the Department of Education and Pell Grant funds provided by the Department of Education," and (2) "[t]hat the defendant did so knowingly and willfully."[2] In her Agreement, Weaver also admitted that she was "in fact guilty" and these facts:

Flagler . . . , a proprietary school in Jacksonville, Florida, which closed in February 1998, offered associate degrees to its students in various medical related programs. Flagler was eligible for and participated in the Title IV Federal Student Financial Assistant Programs which provide various types of grants and loans to eligible schools. The loans are insured or guaranteed by the Department of Education and the grants are provided by the Department of Education. Participating schools are required to make a refund within 30 days after the student withdraws; the ending of a quarter or semester or trimester; or the date the institution determines that the student withdraws, whichever is earliest. The school is responsible for making student refunds in accordance with the distribution formula set forth under 34 C.F.R. 668.22. Schools participating in the federal student financial assistance programs must document student attendance, properly calculate refunds for students who drop out of or withdraw from school, and promptly refund the amount to the Department of Education or the appropriate lender.
The defendant was employed as Flagler's Director of Finance from Fall 1989 until the school closed in February 1998. As Director of Finance, the defendant helped develop corporate strategies,

[2]Although the Agreement did not list "aiding and abetting" in this section, "aiding and abetting" was covered during the Rule 11 colloquy.

3

policies, and budgets. Beginning in about 1991, she was responsible for writing the checks for Flagler, including refund checks. The defendant worked at various offices including Lighthouse Point, Florida, but her duties included handling refund issues for the Jacksonville-based Flagler.

When a student dropped out of or withdrew from Flagler, a drop computation form was prepared at the school and sent to the defendant with the amount of the refund due. Refund request packets were sent from Flagler in Jacksonville to the defendant weekly. The defendant reviewed the paperwork and changed the refund amount if she came up with a different calculation than the school's calculation. The defendant then sent the packet back to Jacksonville so the school could make the calculation changes and return the packet back to the defendant.

The defendant sent monthly accounts payable reports to Mr. Wangberg, which included the aggregate amount of the student refunds due. The defendant also spoke with Mr. Wangberg via telephone a number of times per month and discussed with him, among other things, the refund issue and Flagler's need to make refund payments. Mr. Wangberg was aware of the refund problem but he did not consider making refunds a priority.

In or about February 1997, Mr. Wangberg himself took over as the School Director of Flagler. As noted above, Mr. Wangberg was well aware that Flagler owed a substantial amount of refund monies. When Mr. Wangberg ran the school, he took complete control of the funds and the defendant could not write any checks without his approval. During Mr. Wangberg's tenure as School Director, the amount of refund payments due continued to grow.

Mr. Wangberg and the defendant both knew that Flagler owed refunds and that they had a requirement to make the refunds. From in or about early 1996, Flagler, including Wangberg and the defendant, failed to refund student loans guaranteed by the Department of Education and Pell Grants provided by the Department of Education in the amount of more than $120,000 but less than $200,000, on behalf of approximately 165 students. To date, these refunds have not been made.

B.      **Rule 11 Colloquy**

On August 16, 1999, the magistrate judge reviewed the elements of her offense with Weaver as part of both her waiver of indictment and plea colloquy. Weaver had no questions about them, had read and understood "every page and every word" of her Agreement, and knew "every word and every provision" was binding on her. The judge questioned Weaver: (1) whether she was pleading guilty because she was "in fact guilty"; (2) whether she committed the act charged in the information; (3) whether she understood that her guilty plea admitted the truth of the charge; and (4) whether she understood what she was doing by pleading guilty. Weaver responded affirmatively each time.

During the Rule 11 colloquy, the prosecutor read the above facts from the Agreement and Weaver agreed with them. Weaver also responded affirmatively to these questions:

THE COURT: . . . Did you from in or about early 1996 to in or about February 1998 at Jacksonville in the Middle District of Florida and elsewhere aid and abet Louis Weinberg [sic] in Flagler's failure to make refunds of student loans and Pell grant funds?
DEFENDANT: Yes, sir.
THE COURT: Were the Pell grant [sic] funds provided by the Department of Education?
DEFENDANT: Yes, sir.
THE COURT: Did you knowingly and willfully aid and abet Louis Weinberg [sic] in Flagler's failure to make these refunds?
DEFENDANT: Yes, sir.

The magistrate judge found that a factual basis existed for Weaver's plea, that those facts stated the elements of the offense, and that Weaver's guilty plea was freely, voluntarily, knowingly, and intelligently made.  Weaver agreed with these findings and indicated her satisfaction with her attorney.  The magistrate judge then issued a Report and Recommendation outlining these findings.  Weaver did not object.

Thereafter, on September 8, the district court accepted Weaver's guilty plea, adjudged Weaver guilty, and set sentencing for December 2, 1999.  The court later rescheduled it to February 3, 2000.  During the interim, Weaver replaced her attorney, Mark Perry, with her current attorney, Curtis Fallgatter.  The court continued sentencing to June 15, 2000.

## C.    **Evidentiary Hearing on Motion to Withdraw**

On May 31, 2000, Weaver moved to withdraw her guilty plea.  Weaver's motion asserted that (1) she was under the mistaken impression that the crime to which she pled guilty was a strict liability crime, (2) she was misinformed as to the elements of the crime charged, (3) the facts outlined in the Agreement did not constitute the crime charged, (4) she was misinformed as to the testimony of key witnesses, (5) the Agreement had an internal inconsistency, and (6) she was

6

innocent. During an evidentiary hearing on Weaver's motion, the district court heard testimony from both Weaver and Perry.

### 1. Weaver's Testimony[3]

Weaver testified that she understood the government's witnesses were "going to criminally implicate me" and "basically say it was my fault that the refunds were not paid," but later learned they were supporting her position that a crime had never been committed. At the time of her plea, Weaver had understood "that I simply had to have knowledge that the refunds . . . were due and not paid – and that that made me guilty of a crime."

Regarding the factual statement in her Agreement identifying Weaver as "help[ing to] develop corporate strategies, policies, and budgets," Weaver did not understand this statement to mean that she was involved in developing a strategy for refunds. According to Weaver, Wangberg established the priorities for refund payments before she came to work for Flagler. Weaver's understanding of the *mens rea* required to violate § 1097(a) was as follows:

> At that time I fully understood that the willful issue was the fact, simply the fact that I had to have knowledge that the refunds were due and not paid and that made me guilty. That was it, that the government did not have to prove intent.

---

[3]Weaver also had filed an affidavit with her motion to withdraw. Her hearing testimony essentially covers her affidavit testimony.

Weaver indicated that her attorney "did some research with case law" and said "there was no real case law and that the Bates case was the case law on this matter." This reference was to the Supreme Court's decision in Bates v. United States, 522 U.S. 23, 33 (1997), which held that a specific intent to defraud the government is not an essential element of criminal misapplication under § 1097(a).

In response to the court's questions, Weaver elaborated that she believed "the intent of never paying the refunds back" was a necessary element of a § 1097(a) violation, and that she never had this intent. Weaver explained that "nobody ever even conceived that not paying refunds was a crime." Weaver further indicated that "[m]y whole reason for withdrawing the plea is that had I known and understood the facts and the law in August of '99, I would have never said I was guilty."

Weaver had not seen the pattern jury instructions defining "knowingly" and "willfully" until Fallgatter reviewed them with her. When she entered her plea, Weaver did not know that the definition of "willfulness" meant "that the act was committed voluntarily and purposefully, with the specific intent to do something the law forbids, that is with bad purpose, either to disobey or disregard the law."

Weaver testified that the loan funds were not used for any personal use by either her or Louis Wangberg, as follows:

> A. Did any of them get diverted by you for some personal use of yours or some company or bought a house or a car or some personal use?
> A. No.
> Q. To your knowledge did that get diverted to Mr. Wangberg for his personal use, cars or houses or entertainment or anything other than school business?
> A. No.
> Q. Did you exercise any control or dominion over those funds so they could be used for someone's benefit other than paying school bills?
> A. No. I had no authority. Dr. Wangberg was responsible for setting the priorities, and in the last year of the school establishing all approvals for all disbursements.

During cross-examination, Weaver admitted that (1) she understood a regulation existed which required Flagler to refund student loans on a timely basis, (2) she understood that rules existed which indicated how to make the refunds, and (3) she discussed these rules with Wangberg. Weaver further acknowledged that around June 1996 she, along with Roth and Wangberg, made a collective decision to bring the refunds current. Weaver sent refund checks to the school to have them held there and not mailed out until the cash was received in the bank. Weaver testified that "we did that with other bills too." She acknowledged that the checks "were cut" and "entered into the books as having been paid," and that to the auditors, it would have appeared that the refunds had been made. Weaver further

9

testified that "[w]e had signed a letter to our auditor stating that our refunds were current" when they were not, that when she wrote the checks "we considered them paid," and that the checks were going to sit in a drawer "[f]or a very short time until we got the money in the bank."

Weaver acknowledged her signatory authority over Flagler's operating account, that the operating account was the account from which refunds were paid, and that when refunds were made she would process them. Weaver denied, however, that she was the one who signed the checks, stating that she only "processed them and sent them to the school."

Weaver met with Perry more than five times and was provided a draft of a plea agreement in '98 and another one in March of '99. She reviewed the plea agreement "exhaustively" with Perry and her husband. Perry explained to her that the government's position was "that I simply had to have knowledge that the refunds were due and not paid, period," and that the government had no burden to prove "intent to defraud." Perry did not discuss what "knowingly" and "willfully" meant, but advised her that the government's position was that "they did not have to prove intent" and that Weaver "simply had to know that refunds were due and not paid."

2. **Perry's Testimony**

On direct examination, Perry testified as to the truth and accuracy of his affidavit. Perry's affidavit stated that Bates and § 1097(a) "was [sic] the only case or law addressing the issue of intent that [he] discussed with [Weaver]." Perry's affidavit also indicated that the terms "willfully" and "aid and abet" were not defined in the Agreement or during the Rule 11 hearing and that Weaver "could easily have been confused regarding whether or not her conduct was such as to satisfy the element of willfulness under [the] statute."

On cross-examination, however, when asked about his affidavit statement that Weaver "could easily have been confused," Perry testified that he did not prepare the affidavit, that he "did not put any of the words in [it]," that "[s]he did understand," and that "she didn't indicate to me in anyway [sic] that she was confused." Perry's testimony on cross-examination also contradicted Weaver's assertion that Perry believed that § 1097(a) was a strict liability crime. Specifically, Perry stated that after reading Bates he understood that "you still had to establish that [the failure to refund was] willful and voluntary and a knowing violation of the law . . . [b]ut you did not have to establish, upon reading that case, that [Weaver] had a fraudulent intent."

Perry also testified that in his representation of Weaver he was "convinced" that she knowingly failed to make refunds, that Weaver told him that she

11

participated with Wangberg in decisions involving the refunds, and that Weaver told him that she wrote checks for refunds, kept them in a drawer, and the books showed that the checks had been written.[4]

Perry further testified that Weaver told him that she paid herself a bonus and that he and Weaver discussed the implications of this in deciding whether to plead guilty.[5] Perry's understanding was that Weaver "paid herself and she may have paid Mr. Wangberg a bonus based upon funds that were in the account and the refunds had not been paid." Perry gave the Bates decision to Weaver, discussed it with her, and thought she had a full understanding of criminal intent. Weaver made no indication that she did not understand the elements of the offense. Perry admitted, however, that he couldn't say that he "pulled out the pattern jury instructions and went through willfully and knowingly [with Weaver]."[6]

---

[4]On redirect, Perry was asked, "Would it be a surprise to you if indeed the facts were that all the checks were sent to the school and maintained by the Director, and that if it was in a drawer, it was in a drawer at the school, not in [Weaver's] personal drawer . . . ?" In response, Perry testified that it was his understanding the checks were kept in Weaver's drawer.

[5]On redirect, Perry testified that the bonus was "[i]n the thousands" but that he could not remember the exact amount.

[6]The district court also heard testimony from George Wisnovsky, a private investigator who testified as to the accuracy of his two affidavits recounting what Charles Roth, Flagler's Executive Director, and Joyce Byrd, Flagler's Director of Administration and Financial Aid, had told him during interviews. Although the district court admitted Wisnovsky's affidavits into evidence, it ultimately decided not to consider this hearsay testimony because Roth and Byrd did not sign affidavits and did not testify during the hearing. The district court also found the statements unreliable based on other testimony during the hearing. Contrary to Weaver's contentions, the district court did not err in not considering Wisnovsky's testimony and affidavits

12

**D.       Order Denying Motion to Withdraw**

On September 22, 2000, the district court denied Weaver's motion to withdraw. The district court found (1) that Weaver was not misinformed as to what the words "knowingly" and "willfully" meant, (2) that there was no evidence of misrepresentation by the government as to any witnesses, (3) that any "inconsistency" in the Agreement was adequately addressed during the Rule 11 colloquy, and (4) that Weaver's assertion of innocence alone did not entitle Weaver to withdraw her plea. Although during closing arguments Weaver's counsel had argued that conversion of the loan proceeds for Weaver's own use or benefit of another was also a required element of a § 1097(a) violation, the district court did not expressly address that issue.

The district court ultimately sentenced Weaver to four months' imprisonment and four months' home detention. Weaver timely appealed both the denial of her motion to withdraw and her sentence.[7]

_____

about what Roth and Byrd had told him.

      Michelle Frigola, Flagler's corporate counsel, also testified as to the accuracy of her affidavit. This affidavit, along with her testimony, revealed Frigola's opinion that Weaver was innocent. Frigola also testified about the process by which she prepared her affidavit and her general knowledge about Flagler's failure to make refunds. Frigola's testimony revealed that she knew little about the refund issue, in part, because her legal representation of Flagler was limited to reviewing leases, reviewing contracts, and pursuing payment from students who failed to pay tuition.

      [7]On September 29, 2000, Weaver timely filed a Notice of Appeal from the district court's order denying her motion to withdraw. On October 20, 2000, Weaver timely filed a Notice of

13

## II. DISCUSSION

### A. Rule 32(e): Motion to Withdraw

Weaver filed her motion to withdraw her plea pursuant to Federal Rule of Criminal Procedure 32(e), which provides that "[i]f a motion to withdraw a plea of guilty . . . is made before sentence is imposed, . . . the court may permit the plea to be withdrawn if the defendant shows any fair and just reason." Fed. R. Crim. P. 32(e).[8] The factors to be considered in evaluating whether a guilty plea may be withdrawn include the following: "(1) whether close assistance of counsel was available; (2) whether the plea was knowing and voluntary; (3) whether judicial resources would be conserved; and (4) whether the government would be prejudiced if the defendant were allowed to withdraw his plea." United States v. Buckles, 843 F.2d 469, 471 (11th Cir. 1988) (internal citation omitted).

Weaver contends, inter alia, that her plea was not knowing or voluntary because (1) conversion is an essential element of her § 1097(a) violation, and (2)

---

Appeal from her sentence. This Court consolidated Weaver's appeals.

[8]Although this portion of Fed. R. Crim. P. 32(e) "is to be liberally construed . . . [, i]t is well settled . . . that there is no absolute right to withdraw a guilty plea prior to imposition of a sentence." United States v. Buckles, 843 F.2d 469, 471 (11th Cir. 1988). Instead, "[t]he decision to allow withdrawal is left to the sound discretion of the trial court." Id. The district court's denial of Weaver's pre-sentencing motion to withdraw is reviewed for an abuse of discretion and will not be reversed unless the court's decision is "arbitrary or unreasonable." Id.

she was not advised about the conversion element before entering her plea.[9]

Section 1097(a) provides that "[a]ny person who knowingly and willfully embezzles, *misapplies*, steals, obtains by fraud, false statement, or forgery, *or fails to refund*" financial aid funds provided or insured by the federal government is subject to criminal liability. 20 U.S.C. § 1097(a) (emphasis added). A 1992 amendment added "or fails to refund" to § 1097(a).[10] This Court previously concluded that conversion is an element of criminal misapplication under § 1097(a). See United States v. Kammer, 1 F.3d 1161 (11th Cir. 1993). In this case, however, Weaver was charged with only "fails to refund" and not criminal misapplication. Thus, her appeal presents the issue of whether "fails to refund" is an independent ground upon which criminal liability attaches under § 1097(a), and

---

[9]On appeal, Weaver also claims that the district court erred in denying her motion because (1) she misunderstood the elements of "knowingly," "willfully," and "aiding and abetting," (2) she was innocent, (3) the government misrepresented the strength of their case to Weaver during plea negotiations, (4) the government failed to carry its burden of establishing that prejudice would result if Weaver were allowed to withdraw her plea, and (5) the factual basis for her plea failed to show that she acted "knowingly" and "willfully," or that she "aided and abetted" Flagler's failure to make refunds. After review and oral argument, we conclude that these claims lack merit and do not warrant further discussion. Because we conclude conversion is not an element of Weaver's offense, we need not reach Weaver's claim that the factual basis for her plea failed to show a conversion.

[10]Weaver was charged with aiding and abetting a § 1097(a) violation under 18 U.S.C. § 2, which provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Because § 1097(a) is the underlying substantive crime, we focus primarily on § 1097(a).

15

if so, whether conversion is an element for that separate crime. To answer these issues, we review relevant precedent and then the 1992 amendment to § 1097(a).[11]

## B.      Misapplication Under § 1097(a)

Our circuit's principal decision discussing § 1097(a) is United States v. Kammer, 1 F.3d 1161 (11th Cir. 1993). The indictment charged Kammer with "embezzling, misapplying, and stealing" federal financial aid funds in violation of 20 U.S.C. § 1097(a) and 18 U.S.C. § 2.[12] Kammer, 1 F.3d at 1163. Reversing Kammer's misapplication convictions, this Court concluded that "[t]o establish a criminal misapplication [under § 1097(a)] the government must prove (1) a conversion of the property to the use of the defendant or a third party, and (2) fraudulent intent." Id. at 1165. We defined conversion as "'an act of dominion or control over the property that seriously interferes with the owner's rights.'" Id. (quoting United States v. Jakeway, 783 F. Supp. 590, 597 (M.D. Fla. 1992)).

This Court determined that the government's evidence did not show either a conversion or an intent to defraud. Id. at 1165-66. Kammer owned a school whose financial condition deteriorated; Kammer failed to refund loan payments and the

---

[11]Whether conversion is a required element for a § 1097(a) violation is a question of law subject to de novo review. See United States v. Gray, 206 F.3d 1267, 1271 (11th Cir. 2001).

[12]Kammer was indicted in 1991, before the 1992 amendment which added "or fails to refund" to § 1097(a).

16

withdrawn students' files contained copies of non-negotiated refund checks. Id. at 1162-63. Kammer explained that she was "aging debts," including refunds, so that "the most necessary and immediate debts" could be paid first. Id. at 1163. These included Kammer's "salary, campus renovations, consulting fees, loan repayment to her husband, and her private housekeeper." Id. at n.5.

Because federal regulations allowed the school to "commingle" its own money with federal financial aid funds, this Court concluded that "[t]he fact that [the school] may have paid operating expenses before a student withdrew, and thus did not have money to refund [the Department of Education] is not a conversion."[13] Id. at 1166. The fact that Kammer may have paid other operating expenses before making the refunds also did not establish a conversion because "[w]hat happened in this case is exactly what the program anticipated: a commingling of funds with grant funds being used for operating expenses." Id. This Court concluded that "[u]nder these circumstances, we cannot find that the government intended to maintain supervision and control over the funds after the point of the commingling

---

[13]Specifically, the school was allowed to deposit Pell Grant funds and student loans into its corporate operating account. Kammer, 1 F.3d at 1165. The school paid its debts, operating expenses, and refunds for withdrawn students out of its corporate account. Id. Given this permissible procedure, this Court noted that "when a student withdrew, [the school] may not have had sufficient funds in its operating account to reimburse [the Department of Education] because it had expended monies for other obligations. After all, [the school] could not control the timing of a student's withdrawal." Id. at 1166.

17

of the funds." Id. In addition, this Court held that "the government has not demonstrated that Kammer had the requisite intent to defraud the government." Id. We stressed, however, that "we do not hold that a failure to refund federal monies will never constitute a crime. . . . We reverse in this case strictly on the facts of this case." Id.

After our Kammer decision, the Supreme Court decided Bates v. United States, 522 U.S. 23 (1997). As we now explain, Kammer's conclusions about conversion survive Bates but its holding regarding intent to defraud does not.[14]

Similar to Kammer, the indictment in Bates charged a school's officer with "'knowingly and willfully misapply[ing]'" federally insured student loan funds in violation of § 1097(a) and 18 U.S.C. § 2.[15] Id. at 28. The defendant had "initiated a pattern and practice of not making refunds," permitted management fee and salary payments to take priority over refunds, instructed others to not make refunds, and failed to make the required refunds.[16] Id. at 27-28. The district court dismissed the indictment for failure to allege intent to injure or defraud. Id. at 28.

---

[14]The Supreme Court had granted certiorari in Bates to resolve the conflict between the Seventh Circuit's Bates decision and our Kammer decision regarding whether a specific intent to defraud was required for the crime of misapplication under § 1097(a). Bates, 522 U.S. at 29.

[15]The defendant officer was indicted in 1994 based on his actions during 1990.

[16]The management fees which took priority over refunds were allegedly "'upstream[ed]'" to Education America, Inc., of which the defendant was vice president. Bates, 522 U.S. at 28.

18

Reversing the dismissal, the Seventh Circuit concluded that intent to defraud or injure the government is not an element of criminal misapplication, which requires only that "the defendant misapplied — i.e., converted — Title IV funds and that he did so knowingly and willfully." United States v. Bates, 96 F.3d 964, 970 (7th Cir. 1996). Affirming the Seventh Circuit, the Supreme Court held expressly that the specific intent to injure or defraud the government or another is not an element of the misapplication of funds proscribed by § 1097(a). Bates, 522 U.S. at 29.

Although Bates did not address directly whether conversion is an element of criminal misapplication under § 1097(a), such a conclusion is implicit in its holding that a specific intent to defraud is not a required element of criminal misapplication. Specifically, the Supreme Court quoted and relied on the Seventh Circuit's "working definition" of willful misapplication under § 1097(a), which, in essence, requires a conversion, as follows:

> [W]illful misapplication under § 1097(a) requires the government to allege and prove that the defendant consciously, voluntarily, and intentionally exercised unauthorized control or dominion over federally provided or guaranteed Title IV funds that interfered with the rights of the funds' true owner(s), for the use and benefit of the defendant or a third person, while knowing that such an exercise or dominion over the funds was a violation of the law.

Id. at 31 n.7 (quoting United States v. Bates, 96 F.3d at 970). The Supreme Court relied on this "working definition" to refute the defendant's argument that if intent

to defraud is not an element, "innocent maladministration of a business enterprise" or "unwise" use of funds, as the defendant put it, would fall within criminal misapplication under § 1097(a). Bates, 552 U.S. at 31. The Supreme Court noted that the Seventh Circuit's construction of criminal misapplication under § 1097(a) reaches "only the transgressor who intentionally exercises unauthorized dominion over federally insured student loan funds for his own benefit or for the benefit of a third party." Id. Thus, Kammer's determination that conversion is an element of a § 1097(a) misapplication survives Bates even though its intent-to-defraud holding does not.

## C.    "Fails to Refund" Under § 1097(a)

Although conversion remains an element of misapplication under § 1097(a), the more difficult issue is whether "fails to refund" is an independent ground upon which criminal liability attaches under § 1097(a), and, if so, whether conversion is an element of that offense as well.

In 1992, Congress specifically added "or fails to refund" to § 1097(a). See Higher Education Amendments of 1992, Pub. L. 102-235, § 495, 106 Stat. 631.

Significantly, the act of failing to refund is listed separately from the criminal act of misapplication and is connected by "or."[17]  There is no indication on the face of § 1097(a) that Congress intended "misapplies" and "fails to refund" to be the same thing or interchangeable.  For example, Congress did not amend § 1097(a) to provide criminal penalties for "[a]ny person who knowingly and willfully . . . misapplies by failing to refund."  Furthermore, if this language does not create a ground upon which criminal liability attaches, separate from misapplication, then "or fails to refund" would be mere surplusage.  We decline to read § 1097(a) in this way.[18]  Instead, the text of § 1097(a) is clear and, therefore, we conclude that "fails to refund" is an independent activity which is criminalized under § 1097(a).

Despite the plain language of "or fails to refund" in § 1097(a), Weaver argues that the legislative history of the 1992 amendment supports the conclusion

---

[17]See Garcia v. United States, 469 U.S. 70, 73 (1984) ("Canons of construction indicate that terms connected in the disjunctive in this manner be given separate meanings.").

[18]See Bailey v. United States, 516 U.S. 137, 145-46 (1995) (disagreeing with the argument that a federal criminal statute which prohibits both using and carrying a firearm should be read in a way that would make the terms "use" and "carry" redundant, in part, because "Congress has specified two types of conduct [which are prohibited and] . . . [w]e assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning"); United States v. Canals-Jimenez, 943 F.2d 1284, 1286-87 (11th Cir. 1991) (concluding that the term "found in," as used in a federal criminal statute that imposes liability upon an alien who "enter[s]," "attempts to enter," or is "found in" the United States, "must have a different meaning from 'enters' and 'attempts to enter'" in part because "[a] basic premise of statutory construction is that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage").

21

that "fails to refund" is not a separate ground upon which criminal liability attaches but is merely interchangeable with misapplication. Weaver relies on a House Conference Report which states that the "failure to pay refunds does constitute criminal misapplication under current law. Language is added in this bill merely as a clarification." H.R. Conf. Rep. No. 102-630, at 513 (1992), reprinted in 1992 U.S.C.C.A.N. 334, 628. Weaver contends that "or fails to refund" was added only to clarify that a misapplication may encompass the failure to refund and that it is not an independent ground for criminal liability.

We decline, however, to look beyond the plain language of § 1097(a). In our circuit, "[w]e will only look beyond the plain language of a statute at extrinsic materials to determine the congressional intent if: (1) the statute's language is ambiguous; (2) applying it according to its plain meaning would lead to an absurd result; or (3) there is clear evidence of contrary legislative intent." United States v. DBB, Inc., 180 F.3d 1277, 1281 (11th Cir. 1999). Similarly, the Supreme Court has recognized that "[c]ourts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language" and that "'[o]nly the most extraordinary showing of contrary intentions' in the legislative history will justify a departure from that language." United States v. Albertini, 472 U.S. 675, 681 (1985) (quoting Garcia v. United States, 469 U.S. 70, 75 (1984)). See Ratzlaf v.

22

United States, 510 U.S. 135 (1994) (noting that although there were "contrary indications in the statute's legislative history . . . we do not resort to legislative history to cloud a statutory text that is clear.")

None of these reasons to look beyond the plain language of § 1097(a) exists here. First, as noted, the language of § 1097(a) is unambiguous: the "knowing and willful" failure to make refunds is a criminal act. Second, applying § 1097(a) according to its plain language, and imposing criminal liability for the "knowing and willful" failure to make refunds, does not lead to "absurd" results. See United States v. Williams, 121 F.3d 615, 621 (11th Cir. 1997) (noting that the "[c]riminalization of the willful failure to pay is not new to the criminal code; it appears frequently in the tax statutes"). Finally, the legislative history is not "clear evidence" or an "extraordinary showing" of a contrary legislative intent. Instead, this legislative history is ambiguous. Weaver's interpretation is that the amendment clarified that misapplication may encompass a failure to refund but did not eliminate the conversion requirement for a misapplication, even when the conduct is the failure to refund. Another interpretation, however, is that Congress recognized that it had created a separate crime with its "or fails to refund" language and added this legislative history to foreclose the obvious post-amendment argument that failure to refund only became a crime under § 1097(a) after the 1992

23

amendment.  More specifically, under this interpretation, the legislative history

only makes clear that an individual who failed to refund could always have been

charged with criminal misapplication under the pre-amendment § 1097(a), and that

the addition of "fails to refund" as a separate crime does not change this.[19]

For these reasons, we decline to look beyond the plain language of § 1097(a)

and conclude that, according to its plain language, "fails to refund" is an

independent ground upon which criminal liability attaches.

## A.    Elements of "Fails to Refund"

We next examine whether to engraft an element of conversion onto the

offense of "fails to refund" as courts have done for a misapplication violation

under § 1097(a).  For several reasons, we decline to do so.

First, it is well established that "we ordinarily resist reading words or

elements into a statute that do not appear on its face."  Bates, 522 U.S. at 29

(concluding that the specific intent to defraud is not an element of the crime of

_____

[19]Although Kammer and Bates discussed this legislative history, neither addressed it in this context.  In Kammer, this Court noted the legislative history as follows: "[t]he government submitted legislative history on the Higher Education Act of 1965, indicating that 'failure to pay refunds does constitute criminal misapplication under current law.'  Thus, Congress indicated that persons who failed to refund grant funds to the government could be charged with criminal misapplication."  1 F.3d at 1166 (internal citation omitted).  As already discussed, the issue in Kammer was whether the failure to make refunds was a criminal misapplication under § 1097(a).  Because Kammer was indicted for "misapplication,"and not "fails to refund," Kammer did not address whether "or fails to refund" creates an independent ground of liability.  Similarly, the defendant in Bates was charged with criminal misapplication, not "fails to refund," and, thus, the Supreme Court also did not address that issue.  See Bates, 522 U.S. at 32.

24

misapplication under § 1097(a), in part, because § 1097(a) does not state that the specific intent to defraud is an element). Second, there is no basis upon which we can conclude that Congress intended conversion to be an element of the failure to refund federal financial aid funds under § 1097(a). In contrast, the term "misapplies" implies that a conversion must exist. The Supreme Court long ago construed the language "willfully misapplies" in the context of another federal criminal statute to require an additional, unstated element of "a conversion to [the defendant's] own use or the use of some one else." United States v. Britton, 107 U.S. 665, 666-67 (1883). Thus, because we "presume that Congress expects its statutes to be read in conformity with th[e] [Supreme] Court's precedents," United States v. Wells, 519 U.S. 482, 495 (1997), there is at least some argument that Congress intended conversion to be an element of misapplication under § 1097(a) when it used the misapplication language.

Unlike "misapplies," however, the term "fails to refund" does not imply that a conversion must exist. Weaver does not cite any precedent in which any court has construed the language "fails to refund" in § 1097(a), or similar language in other statutes, to demand a showing of conversion. Thus, we have no reason to believe that Congress intended conversion to be an additional, unexpressed

element of the criminal act of "knowingly and willfully" failing to refund federal

financial aid funds.[20]  As such, we decline to read this element into § 1097(a).

## B.    Weaver's Sentence

Weaver also appeals her sentence contending that the district court

erroneously determined the amount of loss.  We do not address that issue because

Weaver knowingly and voluntarily waived her right to appeal her sentence except

under certain circumstances not relevant to this appeal.[21]

An appeal-of-sentence waiver provision is enforceable if the waiver is made

knowingly and voluntarily.  United States v. Bushert, 997 F.2d 1343, 1350-51 (11th

Cir. 1993).  To establish the waiver's validity, the government must show either

that (1) the district court specifically questioned the defendant about the provision

during the plea colloquy, or (2) it is manifestly clear from the record that the

defendant fully understood the significance of the waiver.  Id.  Here, the waiver

provision was referenced during Weaver's Rule 11 plea colloquy and Weaver

agreed that she understood the provision and that she entered into it freely and

---

[20]Even Weaver seems to agree with this conclusion.  More specifically, Weaver states in her brief that "misapplication . . . is a term of art that . . . means conversion. . . . The term 'fails to refund' carries no such inherent definition."

[21]Specifically, the provision provides that Weaver had "expressly waive[d] the right to appeal [her] sentence, directly or collaterally, on any ground except for an upward departure by the sentencing judge or a sentence above the statutory maximum or a sentence in violation of the law apart from the sentencing guidelines."  We review de novo the validity of an appeal-of-sentence waiver provision.  United States v. Bushert, 997 F.2d 1343, 1352 (11th Cir. 1993).

voluntarily. Thus, her waiver is valid. The exceptions to her waiver do not apply because there was no upward departure by the district court, her sentence is not above the statutory maximum, and her sentence does not violate the law apart from the sentencing guidelines.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the district court did not err in accepting Weaver's guilty plea or in denying Weaver's motion to withdraw her plea. We further conclude that Weaver waived the right to appeal her sentence except under certain circumstances not implicated by her appeal. Thus, we affirm Weaver's conviction and sentence.

AFFIRMED.